ELLEN S. et al., Plaintiffs,

v.

James A. RHODES et al., Defendants.

No. C–3–80–494.

United States District Court,
S. D. Ohio,
W. D.

Feb. 6, 1981.

John C. Holden and Lorine M. Reid, Attys., Dayton, Ohio, for plaintiffs.

David A. Belinky and Deborah A. Piperni, Asst. Attys. Gen., Columbus, Ohio, for defendants.

OPINION SETTING FORTH REASONING BEHIND BRIEF OPINION OF JANUARY 30, 1981, OVERRULING DEFENDANTS' MOTION SEEKING AN ORDER OF THE COURT DISQUALIFYING PLAINTIFFS' COUNSEL AND SUSTAINING DEFENDANTS' MOTION DISMISSING (AND THUS OVERRULING) PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION; CONFERENCE CALL SET TO DETERMINE FURTHER PROCEDURES TO BE TAKEN IN CAPTIONED CAUSE

RICE, District Judge.

On January 30, 1981, this Court filed a brief opinion in which it overruled the Defendants' motion seeking an order of the Court disqualifying Plaintiffs' counsel and sustained Defendants' motion dismissing (and thus overruling) Plaintiffs' request for a preliminary injunction. It is the purpose of this opinion to set forth, in some detail, this Court's reasoning behind the aforesaid decisions reached on January 30, 1981.

Plaintiffs, three voluntary patients of the Dayton Mental Health and Development Center (hereinafter referred to as Center), individually and on behalf of others similarly situated, commenced this action seeking injunctive and declaratory relief against what they alleged to be the arbitrary denial of the civil rights of approximately 350 individuals who are now or who will be residing at the facility during the pendency of this lawsuit. The Defendants are the Governor of the State of Ohio (Rhodes), the Director of the Ohio Department of Mental Health (Moritz), the Commissioner of the Division of Mental Health, Ohio Department of Mental Health (Windmann), the Acting District Manager of District II of the Division of Mental Health, Ohio Department of Mental Health (Kennedy) and the Superintendant of the Center (Mendenhall).

The Plaintiffs allege that they have been and are being deprived of their right to proper and meaningful educational, medical, vocational, psychological, and psychiatric rehabilitation services, as well as recreation, a safe physical environment and meaningful contact with the general population. They further allege that the Defendants have failed and are failing to carry out their responsibilities to residents by reducing staff, programs and materials appropriate to Plaintiffs' needs. Further, the Plaintiffs contend that the Defendants are now ordering the reduction of staff, programs, and services, without guidelines, adequate planning or programming for the welfare or safety of patients and that the Plaintiffs will be physically and mentally harmed as a result of the Defendants' actions.

Along with seeking an order of the Court certifying this case as a class action on behalf of individuals who are or who will be residing at the Center during the pendency of this action, the Plaintiffs seek a declaratory judgment that the Defendants have violated and are violating the Plaintiffs' constitutional and statutory rights.

The Plaintiffs also seek preliminary and permanent injunctive relief ordering all Defendants, but Mendenhall, the Superintendant of the Center, to:

1. Authorize the filling of all existing staff vacancies designated by the Center's Superintendant.

2. Authorize the Superintendant to fill all future vacancies occurring through any form of attrition in order to maintain a "Direct Care" staff ratio of two to one for the mental health wards; and

3. Appropriate and maintain a budget for the Center adequate to support the two to one "Direct Care" staff ratio and all related overhead costs.

Further, Plaintiffs seek preliminary and permanent and injunctive relief ordering *all* Defendants to:

1. Pass and enforce regulations stating that no mental health patient is to be released from the Center unless that patient:

A. Is a voluntary patient and demands release; or

B. Has had a recent medical/psychiatric evaluation, fully documented in a written report, stating that the patient is able to function safely outside the hospital; and

C. Has for the patient a detailed treatment plan developed in coordination with community resources and implemented to meet the patients' treatment and other needs.

2. Take necessary action to provide, in coordination with the Ohio Bureau of Vocational Rehabilitation and with Federal Funds already available through the latter, a pre-vocational and vocational rehabilitation training program for the mental health patients at the Center.

3. Enter into contracts with other Defendants to insure the cooperation necessary to the implementation of any order of the Court.

At the time of the hearing on the request for preliminary injunction, the Plaintiffs had scaled down the scope of the *preliminary* relief requested by limiting their testimony to the Center's inadequate staffing which often causes employees to perform tasks which cut across job descriptions of several different employees, which, in the event of a fire, would render the staff unable to evacuate all patients, which renders the existing staff and other patients liable to injury from violent and dangerous patients, and which gives the patients less therapy time from the staff than is desirable. Specifically, the Plaintiffs sought, at the hearing on their request for preliminary injunction, an order of the Court enjoining the Defendants from laying off or forcing the transfer of 137 employees, thus reducing the staff from its present level of 427 employees down to 290. Such a reduction, Plaintiffs contended, would result in the Plaintiff receiving less than "minimum re-

quirements" for patient care as provided by law, in that the staff would be operating at below what the state defines as "maintenance/crisis care/custodial level."

## A. THE DEFENDANTS' MOTION SEEKING AN ORDER OF THE COURT DISQUALIFYING PLAINTIFFS' COUNSEL

The Defendants' have moved to disqualify Plaintiffs' counsel from participation in this case because of their membership on the Citizens Advisory Board (CAB) of the Center, an entity set up under the Ohio Revised Code to act as a liaison between the community and the institution. According to the Defendants, the Ohio law gives to members of the CAB access to all patient records and treatment plans; its members are in a position of trust and confidence to the institution and its residents and information received is not usually a matter of common knowledge in the community and is often of a highly personal nature. The Defendants further contend that, although the CAB is an autonomous unit in regard to the institution and the community, its members are public officials acting on behalf of the State in matters pertaining to the institution and the community, who are reimbursed for expenses out of the state fund. Therefore, conclude the Defendants, Plaintiffs' counsel have misused their public offices for their own economic gain, have breached their duty of loyalty to the State and to the Institution and have violated applicable conflict of interest canons and codes by using the information obtained while a public official against the governmental body which created the CAB.

Based upon the evidence adduced at hearing upon the merits of this motion, this Court concludes that the Plaintiffs' attorneys, by virtue of their membership on the CAB, are neither public officials nor state employees such as to submit them to the strictures of the conflict of interest canons, codes or statutes. It is axiomatic that a public office is one which is "created by law, with duties cast on the incumbent which involve an exercise of some portion of the sovereign power and in the perform-

ance of which the public is concerned, and which also are continuing in their nature and not occasional or intermittent..." 53 ALR 595 and cases cited therein; see also numerous cases cited by Plaintiffs' counsel in their memoranda contra Plaintiffs' motion to disqualify. Logically, if one is a member of a body that is not a "public office," then such a member can not, by definition, be a public official. See also Advisory Opinion 76–010 of the Ohio Legislative Commission, in which members of the Institutional Advisory Committees (the predecessors to the CABs) were held not to be public officials; see also 79 OAG 49 and 79 OAG 110.

The evidence is clear that the CAB members are not paid a salary, not subject to dismissal, promotion, or removal (except for missing in excess of a given number of meetings), not under the control of any appointing authority and do not have any greater access to confidential and personal patient information than any other member of the community. Conversely, it is clear, based upon the evidence submitted, that the CAB members receive only what information the institution cares to provide them and that its (the CABs) function is to oversee the institution for the benefit of the public. This liaison function would, by definition, prevent its members from becoming employees of the state.

In overruling this motion, this Court did *not* consider the materials attached to the Plaintiffs' memorandum contra the Defendants' motion, filed December 16, 1980.

B. *THE PLAINTIFFS' MOTION SEEKING AN ORDER OF COURT GRANTING A PRELIMINARY INJUNCTION AGAINST THE DEFENDANTS*

At the conclusion of the Plaintiffs' evidence, offered in support of their motion for a preliminary injunction, the Defendants moved to dismiss said motion. The Court indicated that it would consider said request and if, and only if it overruled same, would it then hear testimony from the Defendants on the issue of whether the requested preliminary relief should be granted. As set forth in its brief opinion on January 30, 1981, this Court has sustained the Defendants' motion to dismiss the Plaintiffs' request for preliminary injunction thus, in effect, overruling said request for preliminary relief in its entirety.

██ In ruling as aforesaid, this Court makes the following non-exclusive observations:

1. The United States Court of Appeals for the Sixth Circuit has recently re-emphasized its holding in a series of earlier decisions wherein it stated that a party seeking preliminary injunctive relief must demonstrate to the Court the existence of each and every one of the following four prerequisites:

A. That there exists a strong or substantial likelihood or probability of success on the merits in favor of the party seeking relief;

B. That irreparable injury would result to the party seeking relief should the preliminary injunction not issue;

C. That the issuance of the preliminary injunction would not cause substantial harm to others; and

D. That the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel*, 563 F.2d 256 (6 Cir., 1977).

2. Factors "C" and "D", of necessity, require a balancing test which can only be performed after both sides have presented all their evidence, either in support of or in opposition to the motion for preliminary relief, since such test, of necessity, requires consideration of testimony from the party opposing the granting of preliminary injunctive relief. Because, in this case, the Defendants have elected to move for dismissal of the Plaintiffs' motion at the conclusion of the Plaintiffs' evidence, and will not be presenting evidence on the record, unless and until the Court overrules said motion, it is impossible to determine whether the Plaintiffs' have satisfied the requirements set forth in "C" and "D" above. In short, without Defendants' evidence, it is impossible for this Court to determine, at this point in time, whether the issuance of the preliminary injunction would or would not cause substantial harm to others and

whether the public interest would or would not be served the issuance of a preliminary injunction.

3. This Court has no such difficulty, however, with requirements "A" and "B". Whether these requirements have been met can be determined by the Court without a consideration of the opposing party's evidence; the Court's requiring the Defendants to go forward with their evidence only if the Court determines that the Plaintiffs have introduced sufficient evidence of a probability or substantial likelihood of success upon the merits and the threat of irreparable harm should the requested relief not be granted which, if not countered in a legal sense, would support the granting of the preliminary injunction. In this case, the Court determines that the Plaintiffs have failed to make out a "prima facie" case on either one of these two prerequisites and that, therefore, a dismissal of their motion seeking preliminary relief is in order.

4. *THE PLAINTIFFS HAVE FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD OR PROBABILITY OF SUCCESS UPON THE MERITS*

a. *The Plaintiffs have not been shown to be proper parties to receive the relief sought.*

■ This Court notes with regret that neither the Plaintiffs nor the Defendants have seen fit, in spite of this Court's expressed concern, to address the issue of whether the Plaintiffs are the proper parties to receive the relief sought. The Plaintiffs are voluntary patients, according to the complaint and the stipulations of counsel. It is a well settled doctrine, at this point in time, that the right to treatment is linked to the deprivation of liberty; involuntary patients having a constitutional right to treatment because of their involuntary commitment or confinement. *Wyatt v. Aderholt*, 507 F.2d 1305 (5th Cir. 1974); *Rone v. Fireman*, 473 F.Supp. 92, 119 (N.D. Ohio, 1979); *Harper v. Cserr*, 544 F.2d 1121 (1st Cir. 1976); *Goodman v. Parwatikar*, 570 F.2d 801 (8th Cir. 1978) The present state of the law appears to be that, unless the right to treatment derives from some other source than involuntary residence in a state mental health facility, *voluntary* patients have no constitutional right to treatment any more than they have a right to continued residence at such a mental health facility. Since they have not had their liberty restricted by judicial process or by any other external force, voluntary patients are being confined by choice. If their rights have been violated while they have voluntarily committed themselves, they may have both the right to immediate release and a right to recover money damages to compensate them for the injury suffered. However, they may not, under the present state of the law, have a right to the relief sought in this lawsuit—an injunction ordering the Defendants to refrain from laying off staff; ordering them to fill vacancies and ordering them not to release patients, but, rather, to retain them and to provide them with treatment. *Wyatt v. Aderholt, supra; Rone v. Fireman, supra; Harper v. Cserr, supra; Goodman v. Parwatikar, supra.*

While the law may yet reach the position where voluntary patients are treated the same as involuntary patients, insofar as the right to treatment is concerned, such a legal frontier has yet to be breached.

The above issue is of paramount importance to the Court's decision on the Plaintiffs' motion seeking a preliminary injunction. If, in fact, voluntary patients cannot, under the present state of the law, receive the relief ultimately requested, then, quite clearly, said Plaintiffs are not entitled to a preliminary injunction which, in effect, freezes matters in a *status quo* situation pending final resolution of the merits of the controversy. Since Plaintiffs who are voluntary patients are not, under the present state of the law, entitled to the relief sought, it is clear that said Plaintiffs cannot, under any state of facts, show a strong or substantial likelihood or probability of success upon the merits of this lawsuit.

This Court was under the understanding, based upon the allegations contained in the complaint and on the basis of comments made by counsel prior to the hearing, that Plaintiffs' counsel would attempt to show that the voluntary patient-plaintiffs were voluntary patients in name only in that said

Plaintiffs did not fully comprehend their legal rights or legal status, having had an attorney present neither at their hearing nor when they signed as a voluntary patient. However, the Plaintiffs' evidence in support of their request for preliminary injunctive relief, has totally failed to address this issue.

While this issue has been, along with one other issue addressed below, of crucial importance in the Court's denial of the Plaintiffs' request for preliminary injunctive relief, said issue might prove to be dispositive of the entire lawsuit, if same is not immediately addressed by Plaintiffs' counsel. The Plaintiffs have requested this Court to certify the class as set forth in the complaint. Counsel must address the question, within a time frame to be set by the Court at a pretrial conference, of whether three named voluntary patient-plaintiffs can, in view of the fact that such voluntary patients have, at present, no constitutional right to treatment, fully and adequately represent the interest of the class defined as persons now residing at the Center or who will during the pendency of this suit reside therein, one-third of which are, by the Plaintiffs' own estimate, involuntary patients who *do* possess such a constitutional right to treatment. The failure to address this issue, and to address it successfully, will mean not only the denial of class certification but also, in its ultimate extreme, absent a substantial amendment of the complaint and substitution of parties, in the dismissal of this lawsuit.

b. *The Plaintiffs have failed to show the threat of irreparable harm should the requested injunctive relief be denied.*

One of the determining factors in deciding whether the party desiring injunctive relief has demonstrated a strong or substantial likelihood or probability of success upon the merits is whether such party has demonstrated the threat of irreparable harm existing to it should the requested injunctive relief be denied. Such a showing has not been made by the Plaintiffs herein. ■ Conditions for and circumstances of patient treatment are not operating under optimum conditions at the Center (nor are

they anywhere in any state institution in the Wonderful World of Ohio, where years of penurious state administration and official neglect, compounded by a budgetary crunch of major proportions has caused some people to speak of a crisis situation). However, the fact remains that, *at the time of the hearing on the Plaintiffs' motion seeking preliminary relief*, the great preponderance of the evidence indicated that the Center was providing minimally adequate care for its patients, in all respects. Moreover, the Center was accredited by the Joint Commission on Accreditation of Hospitals (JCAH), which indicates that said nationally recognized accrediting agency was satisfied that the Center was providing certain minimum requirements in patient care. This accreditation was a result of an early September, 1980, survey. As of the date of the hearing, the Center had experienced no significant staff changes since the survey period which would, in any way, cause the accreditation to be withdrawn. (Transcript of Mendenhall at 9) Furthermore, the testimony adduced at said hearing does not satisfy this Court that the Center represents an unsafe or inhumane environment for its patients. Thus, while things are far from utopian and, quite obviously, could be better, the then present level of medical treatment at the Center, including the environment in which those services are provided, is neither less than minimally adequate nor offensive in the constitutional sense.

■ The Plaintiffs devoted a great deal of effort in an attempt to show that, should the 137 lay-offs and forced transfers take place, the Center could lose its JCAH, Medicaid and Medicare accreditation and, additionally, would be forced to operate on such a skeleton staff that patient care and treatment would be virtually non-existent, with patients exposed to the risk of harm while on the premises and to an early release from the Center at a period of time when they were ill equipped to handle the outside world. This may well be true. *However*, it must be emphasized that, *at the time of the hearing*, while Roger Mendenhall did testify that he had to prepare the plan to prune back the staff and spending level of his facility, there was no testi-

mony that he was being ordered, or was even aware that he would in the future be requested, to reduce the number of his staff at the Center either to the degree argued by Plaintiffs' counsel or, as a matter of fact, in any significant fashion.* Therefore, the parade of horrors that would result upon the reduction of staff by 137 employees is speculative in nature only, because there has been introduced no hard evidence that such a reduction has been ordered, ever would be ordered, or would ever take place. It is an elementary proposition of law that, in order to invoke the jurisdiction of the Court, Plaintiffs must allege that they have sustained, or are in immediate danger of sustaining, some direct injury as a result of the challenged conduct of the Defendants. Injuries or events which may or may not occur are insufficient for purposes of standing. Those who seek to impose the power of federal courts must allege an actual case or controversy. If this case or controversy requirement is not satisfied, the Plaintiffs may not seek relief on behalf of themselves or any other purported class members. The case or controversy requirement is not satisfied by general assertions or inferences that irreparable harm may be threatened should a certain course of conduct be taken which has either not been ordered or which gives no certain indication of being ordered in the near future. The Court is simply not in the business of giving advisory opinions. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) This lawsuit, given its perimeters as set forth in the complaint, gives every indication of being prematurely filed.

This Court must emphasize that, even if the threat of irreparable harm had been shown, it would be powerless to grant the preliminary relief requested, due to the fact that the named Plaintiffs are improper parties to obtain the relief sought and, therefore, they have not shown a substantial likelihood or strong probability of success upon the merits. See Section 4(a), *supra.*

---

* Mendenhall's testimony (T–31) that he felt that 137 people would have to be transferred and that the remaining staff would not be sufficient to give the patients proper care and treatment

5. *The Plaintiffs have failed to show the threat of irreparable harm should the requested injunctive relief be denied.*

A discussion of the Plaintiffs' failure to show the threat of irreparable harm has been discussed, *supra,* at Section 4(b).

WHEREFORE, based upon the aforesaid, this Court reaffirms its ruling of January 30, 1981, overruling the Defendants' motion seeking an order of the Court disqualifying Plaintiffs' counsel and sustaining Defendants' motion dismissing (and thus overruling) Plaintiffs' request for a preliminary injunction.

Counsel listed below will take note that a *telephone pretrial conference,* in order to determine the further course of action in the captioned cause, will take place at 8:40 a. m. on Thursday, February 19, 1981.

---

does not constitute a decision on the part of the Defendants to order and carry into effect the layoffs and forced transfers.