Walter WOE, By his mother and guardian, Wilma WOE, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Mario CUOMO, individually and as Governor of the State of New York; William Morris, individually and as Acting Commissioner of the Department of Mental Hygiene of the State of New York; Louis Smith, individually and as Director of Kingsboro Psychiatric Center, Defendants.

No. 75 CV 1029 (ERN).

United States District Court,
E.D. New York.

March 16, 1983.

Morton Birnbaum, Brooklyn, N.Y., for plaintiffs.

Robert Abrams, Atty. Gen., State of N.Y. by Caren S. Brutten, William J. Caplow, Asst. Attys. Gen., New York City (New York State Office of Mental Health, New York City by John Petrila, and Seth Abrams, New York City, of counsel), for defendants.

NEAHER, District Judge.

This motion for summary judgment in the class action centers essentially on a single issue: whether a State mental hospital which is accredited by the Joint Commission on Accreditation of Hospitals ("JCAH") is necessarily in compliance with due process requirements.[1] In addition to resolving that issue, however, a myriad of other outstanding procedural and substantive matters pending in this needlessly complex seven-and-one-half year old action will be disposed of. For clarification, a review of the lengthy history of this case is necessary.

*Background*

Walter Woe (a pseudonym) was an involuntarily committed mental patient at Brooklyn State Hospital (since renamed "Kingsboro Psychiatric Center"), a New York State public hospital for the mentally ill, when this class action commenced.[2] In his amended complaint, he alleged that the hospital was overcrowded, understaffed, and lacked adequate facilities, and that its population was more likely to be comprised of individuals who were less wealthy, more ill, and black than the population of private hospitals. He further contended that private hospitals, which provided adequate care, refused to accept poor, black, involuntarily committed patients. He sought an end to what he labelled an invidiously "sanist" and racist two-tiered system of mental health care.

Woe raised multiple legal issues, seeking declaratory and injunctive relief against numerous defendants. First, he attacked the constitutionality of certain disparities in the award of Medicaid benefits to patients in private and State mental hospitals. Next, he asserted that the New York Mental Hygiene Law ("MHL") unconstitutionally failed to provide for a right to treatment and a means to enforce that right. Finally, and most significant to the current motion, he claimed that an adequate standard of care could be achieved only if the care provided by the State matched the care provided in private hospitals. This claim was grounded in the fourteenth amendment equal protection and due process clauses.

In the course of ruling on discovery matters and defining the scope of litigation, orders on multiple motions have been issued which eliminated certain issues and addressed other matters still at issue in the case. In *Woe v. Mathews,* 408 F.Supp. 419 (E.D.N.Y.1976), *aff'd sub nom. Woe v. Weinberger,* 562 F.2d 40 (2d Cir.), *cert. denied,* 434 U.S. 1048, 98 S.Ct. 895, 54 L.Ed.2d 799 (1977), the Court dismissed the Medicaid claims against the federal defendants as meritless based on the Supreme Court's summary affirmance in *Legion v. Richardson,* 354 F.Supp. 456 (S.D.N.Y.), *aff'd sub nom. Legion v. Weinberger,* 414 U.S. 1058, 94 S.Ct. 564, 38 L.Ed.2d 465 (1973), *id.* at 424–26; upheld the constitutionality of the New York State Mental Hygiene Law ("MHL") against an inaccurate assertion that it failed to provide for a statutory right to treatment, *id.* at 426–28; and certi-

---

1. Plaintiffs have also raised allegations of constitutional inadequacy of conditions in a facility that loses Health and Human Services ("HHS") certification. In light of the findings made herein concerning JCAH accreditation, and because HHS certification itself is dependent upon JCAH accreditation, 42 U.S.C. § 1395x(f), it is unnecessary to reach the issues concerning loss of HHS certification.

2. The record indicates that Woe is now deceased.

fied a class comprised of "all persons between the ages of 21 and 65 who are or will be involuntarily civilly committed to New York State mental institutions." *Id.* at 429. Denying the State defendants' motions to dismiss the remaining claims, the Court found that the plaintiff had stated two distinct constitutional claims which could not be summarily dismissed. Those claims, which remain the heart of this action, were described succinctly:

"Plaintiffs seek to end a self-styled 'two-tiered' system of mental care in which, they allege, some persons, those voluntarily admitted to mental hospitals, receive care in equipped facilities and the remainder, involuntary committees, are condemned to custodial care in State mental institutions.

"They have constructed the following argument. An involuntarily committed mental patient has a right, under the due process clause, to adequate treatment. . . . Involuntarily civilly committed patients are only sent to State mental institutions; voluntary committees go to psychiatric facilities in general hospitals. Patients in State mental institutions do not receive adequate treatment; patients in general hospitals do receive treatment. Therefore patients in State mental institutions have a right to be committed in general hospitals with adequate funds for treatment, or, at a minimum, to adequate care and treatment in State institutions." *Id.* at 428 (citation omitted).

Plaintiffs' first claim was and is that the "two-tiered" system violates their rights under the equal protection clause by treating similarly situated mentally ill individuals differently. Plaintiffs sought originally and apparently persist in desiring injunctive relief mandating "a change in State practices in involuntary commitments from State institutions to other facilities," *id.,* presumably private institutions. As this Court noted in its earlier order, however, a mental patient does not have a constitutional right to be committed to a private, rather than a State, hospital. Thus, only the narrower equal protection claim of whether the State is treating "similarly situated mental patients in an evenhanded manner" remains at issue in this case. *Id.* at 429.

Plaintiffs' second claim then and now alleges that certain State hospitals, or possibly the State system in its entirety, provide constitutionally inadequate care, treatment, and facilities in violation of plaintiffs' due process rights. As this Court noted:

"Involuntary commitment to a mental hospital involving, as it does, a deprivation of liberty, must be scrutinized under the due process clause. *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975). The right to a humane and safe living environment, *Welsch v. Likins* [373 F.Supp. 487] at 502–03, the right to the least restrictive alternative in confinement, *id.* at 501, the right to be protected from harm, *New York Association for Retarded Children, Inc. v. Rockefeller* [357 F.Supp. 752] at 764, and most recently, the constitutional obligation of the State not to 'confine without more a nondangerous individual who is capable of surviving safely in freedom by himself' or with the help of others, *O'Connor v. Donaldson, supra,* 95 S.Ct. at 2494, have each been recognized by courts for those civilly confined under State authority.

". . . As a tentative formulation it would seem encumbent upon the State as confiner to minimize the mode of confinement, *Welsch v. Likins, supra,* and to employ whatever means are necessary, including such care and treatment as are reasonably possible in the circumstances of the case, to promote the speedy release and return to liberty of the person confined. The State defendants' motions to dismiss the constitutional claims are therefore denied." *Id.* at 428–29 (footnote omitted).

Finally, various motions to amend the complaint to add new plaintiffs, defendants, and causes of action were dismissed without prejudice. Most significantly, the joinder of a class of federal defendants based on the allegation that the federal accreditation criteria used to determine whether patients

received Social Security Income benefits was unconstitutional was denied because the program "was different in nature and purpose than those which Woe has attacked, and [the claim involved] a class different from that which Woe purports to represent." *Id.* at 430. Also important to the present claims, a motion to add the JCAH and certain of its agents and a claim alleging that the JCAH denied plaintiffs their constitutional rights by utilizing disparate accreditation standards for public and private mental hospitals was denied because the Court found that "this new claim will be better examined in a separate action as it raises decidedly new issues and a different array of defendants." *Id.*

A year later, multiple procedural motions were resolved in a second, unpublished Order. *Woe v. Mathews,* 75 CV 1029 (E.D. N.Y., Jan. 13, 1977). Plaintiffs had moved to consolidate the apparently related cases of *Koe v. Mathews,* 76 CV 64, and *Yoe v. Kolb,* 75 CV 2178. The Court dismissed *Koe* as moot because the federal defendants had already rescinded the challenged termination of benefits.[3] *Id.,* slip op. at 4–5. The Court then dismissed the claims against the federal defendants in *Yoe* as barred by the first *Woe* decision, 408 F.Supp. at 424–26, and by *Legion, supra, id.,* slip op. at 3, and consolidated the claims against the State defendants into the instant case. *Id.,* slip op. at 7.

Plaintiffs again sought to add new defendants and new causes of action, including a challenge to a State statute which denied the right to vote to institutionalized mental patients. Finding "no valid reason for joinder," the proposed amendment was denied "in the interests of orderly litigation and the forthright presentation of the proposed claim." *Id.,* slip op. at 5. Plaintiffs also renewed and were again denied their previous motion to add the JCAH defendants. *Id.*

Finally, defendants' motions to limit the class to patients at the Kingsboro Psychiatric Center, and plaintiffs' motion to enlarge the class to eliminate the age restrictions, were both denied "pending clarification of the issues which will form the essence of the action as discovery progresses." *Id.* The Second Circuit affirmed the order on March 29, 1978. In the interim, only one conference was held, resulting in an indefinite adjournment of the case.

The case remained dormant until late February, 1980, when plaintiffs brought on an order to show cause why the Kings Park Psychiatric Center should not be enjoined from further operations. This motion was precipitated by Kings Park's loss of JCAH accreditation. Papers were filed by all parties. Plaintiffs' papers additionally requested an enlargement of the class; joinder as defendants of the directors of the three nonparty departments of the Mental Health Information Services; certification of several defendant classes, including the directors of all State and private mental hospitals, the chairmen of all medical schools within the State, and all State court judges; reconsideration of the constitutionality of the MHL;[4] reconsideration of the denial of the motion to amend the complaint to add the right to vote issue and the defendants appropriate to that issue;[5] and reconsideration of the denial of the motion to add the JCAH as a defendant and to assert new claims against the JCAH, all of which defendants opposed.

---

3. The Social Security Administration had originally indicated that certain benefits to residents of Pilgrim Psychiatric Center would be terminated because of the loss of JCAH accreditation. The Court had previously denied plaintiffs' motion for a temporary restraining order seeking to prevent the agency from notifying residents of the proposed termination. *Woe v. Mathews,* 75 CV 1029 (E.D.N.Y., November 21, 1975). Joinder of this claim and its additional defendants was then denied in *Woe,* 408 F.Supp. 419 at 430, discussed *supra.* In the interim, the agency decided to continue the funds.

4. This part of the motion to reconsider must be denied in light of this Court's decision in *Project Release v. Prevost,* 551 F.Supp. 1298 (E.D.N.Y.1982).

5. The Court adheres to its prior decision on this issue. *Woe v. Mathews,* 75 CV 1029, slip op. at 5 (E.D.N.Y., January 13, 1977).

On May 13, 1980, plaintiffs delivered a letter discussing, amidst numerous discovery matters, their intention to seek an injunction of the operation of Hudson River Psychiatric Center. A conference was held the next day and discovery matters, procedural complications, and scope of the litigation were discussed at length. The pending and proposed injunction motions and all related legal motions were held in abeyance to await the outcome of discovery and a more definitive focus of the case. *See* Transcript of Conference dated May 14, 1980.

Both the docket sheet and the transcripts of subsequent conferences depict a preoccupation by all parties with discovery and procedural matters for well over one year. In the interim, Kings Park and Hudson River apparently regained their accreditation. The status of certain other institutions was in flux as well.

Finally, the parties appeared to focus on what they saw as remaining at issue in the case, and on May 24, 1982, defendants filed this summary judgment motion, addressing essentially the same legal issues underlying the preliminary injunction motion. The Court established deadlines extending into November for opposing and reply papers, indicating an intention to decide finally the long-disputed applicable legal standard.

In response, however, the plaintiffs attempted to bring on yet another order to show cause as to why the Court should not enjoin the operations of Manhattan Psychiatric Center, a State facility which had lost its JCAH accreditation and HHS certification, and South Beach Psychiatric Center, which had lost its HHS accreditation. Given the numerous pending procedural motions and the anticipated clarification of the legal issues, the Court refused to sign the order but did accept the papers for consideration.

Legal issues raised and apparently resolved in earlier stages of this action nevertheless seem still to be contested by the parties. This Court intends by this Order to resolve the numerous interrelated legal arguments raised now for the first time, raised earlier but held in abeyance, and raised for reconsideration despite earlier resolution.

### JCAH Accreditation

Plaintiffs in their amended complaint assert that despite JCAH accreditation, New York State psychiatric centers are "overcrowded, understaffed and [have] inferior physical facilities," and that these inadequacies must be remedied to ensure that patients "will regain [their] health, and therefore [their] liberty as soon as possible . . . . and to assure that the staff of the State facility will have the time and skill to properly determine whether or not [a patient] needs to be admitted by involuntary commitment and when he can be discharged." Amended Complaint at 4, 5. Each violation alleged by plaintiffs is addressed by one or more of the JCAH accreditation criteria.[6]

■ Defendants contend in this summary judgment motion that JCAH accreditation criteria equal or exceed the due process standard for adequate care. For the reasons that follow, the Court holds that the JCAH accreditation criteria comport with or exceed due process requirements, and that JCAH accreditation is *prima facie* proof of adequate care.

---

**6.** JCAH publishes a detailed statement of its accreditation criteria. *JCAH Consolidated Standards Manual* (hereinafter "*JCAH Manual*"), Exhibit B to Affidavit of Gerald Errion on behalf of Defendants (hereinafter "Errion Aff.). One major category of JCAH accreditation criteria addresses the management of each patient's needs and progress, and a second category details the types of services which must be provided and the acceptable forms these services may take. *Id.* at 61–132. The specific controls imposed on quality, quantity, size and space throughout these two categories make it impossible for a facility JCAH found to be overcrowded to meet JCAH standards. Similarly, a third category broadly addresses program management and monitors in detail the size, qualifications, and continued development of a facility's staff. *Id.* at 3–59. Concern for an adequate physical plant and an appropriate therapeutic environment permeates the criteria addressing patient services, *id.* at 61–132, and a fourth category separately regulates physical plant management. *Id.* at 133–59.

The rights of the involuntarily committed have been recently considered by the Supreme Court. In *Youngberg v. Romeo,* —— U.S. ——, ——, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982), the Court addressed whether and to what extent an involuntarily committed mental retardate had "liberty interests ... in safety, freedom of movement, and training." No question existed but that an involuntarily committed patient had a substantive due process right to "adequate food, shelter, clothing, and medical care." *Id.* (footnote omitted). The Court held that an involuntarily committed mental retardate has a constitutionally guaranteed right to "minimally adequate training" to ensure his "liberty interests in safety and freedom from unreasonable restraints." *Id.* at 2461.

The Court noted, however, that these liberty interests were not absolute, but had to be balanced with legitimate State interests. Recognizing the need for a standard by which courts could determine whether this balance had been properly struck, the *Youngberg* Court continued:

> "In determining what is 'reasonable'—in this and in any case presenting a claim for training by a state—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.... For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 2461–62 (footnotes and citations omitted).

While *Youngberg* involved a single patient seeking damages, the instant class action seeks broad injunctive relief mandating minimally adequate conditions in the entire State mental health system. Regardless, the judgment of psychiatric professionals must still be viewed by this Court as presumptively valid, and judicial interference must be minimized. Defendants have successfully demonstrated that JCAH accreditation constitutes such an exercise of professional judgment, and plaintiffs have not given the Court any reason to look further.

The JCAH hospital accreditation program began in 1952, evolving from the American College of Surgeons' national hospital standardization program. *JCAH 25th Anniversary Brochure,* at 1–3, Exhibit C to Errion Aff. (hereinafter *"JCAH Brochure"*). The 20-member JCAH Board of Governors is selected by the American College of Physicians, the American College of Surgeons, the American Hospital Association, and the American Medical Association. Errion Aff. at 2. Although its accreditation program is voluntary, JCAH accreditation is required before a facility will qualify for HHS funding. 42 U.S.C. § 1395x(f)(5).

By its own description, the JCAH "provides a professionally recognized benchmark by which a facility may expect to be measured in its pursuit of excellence." *JCAH Brochure* at 4. Its criteria are designed to exceed minimally adequate standards:

> "All Joint Commission standards are expected to have certain characteristics; they must be valid, that is related to the quality of care or services provided; they must be *optimal,* reflecting the highest state of the art; they must be *achievable,* meaning that compliance with them has been demonstrated at an existing facility; and compliance with them must be *measurable.*" *Id.* at 3 (emphasis added).

The JCAH criteria encompass four broad categories: program management, patient management, patient services, and physical plant management. *JCAH Manual* at vii. Periodic comprehensive evaluations by JCAH surveyors, usually a psychiatrist and

two additional professionals, examine numerous components of a facility's operation under each of these broad categories. Errion Aff. at 4–5.

The team of surveyors' on-site inspections usually last three to five days. *Id.* at 5. Prior to and throughout a scheduled inspection, the surveyors solicit comments from the public, consumers, and staff. *JCAH Manual* at xiii. During an inspection the team of surveyors routinely interview staff members, and examine a randomly selected crosssection of patient records. Errion Aff. at 5. At the conclusion of the inspection, a summation conference is held between the surveyors and the hospital's staff and administration to discuss any deficiencies and to support corrective measures. *Id.*

A review of the surveyors' report and recommendations, and of all other relevant information, is made by the Accreditation Program for Psychiatric Facilities staff, which makes a final recommendation to the Board of Commissioners Accreditation Commission. *Id.* at 6. A final accreditation decision is based upon numerous considerations, including the facility's therapeutic environment, clinical staff, and medical records. *Id.* at 6–7. Essentially, JCAH accreditation must be supported by

"evidence of overall compliance with standards, progressive advancement toward more complete compliance, and the absence of any serious impediments to patient safety or the quality of care." *JCAH Brochure* at 9.

Several courts have cited the JCAH accreditation criteria as a valid measure of adequate care. For example, in *Ellen S. v. Rhodes,* 507 F.Supp. 734 (S.D.Ohio 1981), plaintiffs sought injunctive relief to correct alleged inadequacies in an Ohio mental health center. Finding that the patients were receiving minimally adequate care and thus had not demonstrated irreparable harm, the court added: "[T]he Center was accredited by the Joint Commission on Accreditation of Hospitals (JCAH), which indicates that said nationally recognized accrediting agency was satisfied that the Center was providing certain minimum require-

ments in patient care." *Id.* at 739. Other courts have similarly relied upon compliance with JCAH accreditation criteria as proof of constitutionally adequate conditions. *See, e.g., Davis v. Hubbard,* 506 F.Supp. 915, 920, 923 (N.D.Ohio 1980); *Welsch v. Likins,* 373 F.Supp. 487, 503 (D.Minn.1974). In some instances, JCAH standards were held to exceed due process requirements. *See, e.g., Davis v. Balson,* 461 F.Supp. 842, 853 (N.D.Ohio 1978).

JCAH is a highly respected organization of psychiatric and medical professionals, and the value of its accreditation program has been recognized by Congress and the courts. Defendants' affidavits and exhibits demonstrate that JCAH conducts comprehensive surveys of all aspects of the operations of a facility requesting accreditation, and that it reaches accreditation decisions after careful review and based upon valid and even admirable standards. Plaintiffs have come forward with no factual assertions to prevent this Court from concluding that due process standards are satisfied by JCAH accreditation criteria. In fact, plaintiffs' supporting affirmation itself concedes that JCAH accreditation and HHS certification are "*prima facie* proof of adequacy." Affirmation of Morton Birnbaum, M.D., Esq., on behalf of Plaintiffs, at 21.

Plaintiffs vehemently argue, however, that they should be allowed " 'to pierce the accreditation veil' when they can present sufficient data of inadequate care to a court." *Id.* at 22. First, although they continuously maintain that various State psychiatric centers are not in compliance with due process mandates, plaintiffs have never clearly articulated what they believe to be "adequate care." Additionally, plaintiffs have never presented any "data" to this Court to indicate inadequate care. Instead, in their most recent papers, they state:

"Plaintiffs define the right to treatment objectively as at least requiring the same level of care and the same *per diem* expenditures as that received by similarly afflicted socially advantaged patients in voluntary general hospital in-patient psy-

chiatric facilities in the same community." Birnbaum Affirmation at 20.

The Court agrees with defendants that plaintiffs' definition of a "right to treatment" is not supported in the law. Similarly, although plaintiffs have repeatedly made comparisons between the funding of private facilities and the funding of public facilities, these dollar amounts do not give rise to even an inference of the inadequacy of the latter.

■ A State has no duty under the Constitution to provide services to the mentally ill. *New York Association for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 761 (E.D.N.Y.1973); *Welsch,* 373 F.Supp. at 498; *cf. Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Involuntary commitment is a justifiable deprivation of liberty; the restrictions the State may impose on the freedom of the involuntarily committed is clearly limited, however, by their due process rights. *Youngberg,* 102 S.Ct. at 2458. Due process considerations require the State to provide minimally adequate services once it undertakes the care of the involuntarily committed. *See New York Association for Retarded Children, Inc. v. Carey,* 631 F.2d 162, 165 (2d Cir.1980); *Welsch,* 373 F.Supp. at 499. This Court cannot say, however, that once the State chooses to fund mental hospitals, that it is required to budget its monies so as to meet the same degree of services as the private sector chooses to provide. *See New York Association for Retarded Children, Inc.,* 631 F.2d at 165, 166 n. 3 (2d Cir.1980); *cf. Dandridge,* 397 U.S. at 487, 90 S.Ct. at 1162. The question is whether the State services meet the Constitution's minimum standards, not whether the State hospitals match the quality of private institutions. *See Youngberg,* 102 S.Ct. at 2461 ("whether the [patient's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests").

Finally, plaintiffs have alleged no facts to show that JCAH accreditation is not the result of a careful evaluation process, but rather a mere "veil" hiding due process violations. Plaintiffs do point to two instances where JCAH awarded accreditation, but later reevaluated and withdrew the accreditation upon having certain inadequacies called to its attention. Birnbaum Affirmation at 22. These allegations do nothing to show that the JCAH accreditation criteria or procedures are not a valid measure of adequate care. On the contrary, these instances of reevaluation demonstrate that plaintiffs could challenge an invalid accreditation of an inadequate facility through recourse to the JCAH itself.

Circumstances may exist to warrant a court to inquire into whether a JCAH accreditation decision actually resulted from a valid exercise of professional judgment, or whether JCAH standards have fallen below what is needed to ensure minimally adequate care. Plaintiffs simply have not come forward with any facts to justify such an inquiry at this time. On the contrary, defendants' undisputed supporting affidavits and exhibits demonstrate that New York's compliance with JCAH accreditation criteria, as determined by a valid exercise of professional judgment of the impartial JCAH staff, necessitates a conclusion that the State has met its obligation of adequate care under the due process clause.

Furthermore, plaintiffs' repeated motions to add the JCAH and its agents as defendants and to amend the complaint to allege a claim of conspiratorial denial of due process rights by the JCAH has been twice denied, and is denied again. JCAH's practices in meeting its own standards and procedures were not within the original contemplation of this action, and plaintiffs have long been on notice that redress on those grounds should be sought, if at all, in a separate action. *See Woe,* slip op. at 5; *Woe,* 408 F.Supp. at 430.

*Loss of JCAH Accreditation*

Plaintiffs have repeatedly argued that loss of JCAH accreditation or HHS certification demonstrates conclusively that a facility is failing to provide adequate care. During the pendency of this suit, plaintiffs have sought injunctions halting admissions

to various nonaccredited or noncertified facilities. Recently, plaintiffs have added a claim for damages on behalf of the class member State hospital residents for any period of nonaccreditation or noncertification. Because the parties have treated plaintiffs' argument for damages and their renewed arguments for injunctive relief as implied cross-motions for partial summary judgment, the Court will address the merits of this claim.

While conformity with JCAH accreditation criteria may demonstrate compliance with due process standards, loss of JCAH accreditation or HHS certification does not necessitate a finding that the nonaccredited or noncertified facility is inadequate. The due process clause acts to assure the involuntarily confined that the State will accord them the necessities of life, reasonably safe conditions, reasonably nonrestrictive confinement, and minimally adequate training to protect their safety and freedom rights. *Youngberg,* 102 S.Ct. at 2462–63. Due process protections look to the reasonableness and minimal adequacy; JCAH standards, in contrast, seek to establish optimum conditions in accredited facilities. *JCAH Brochure* at 3; *see Davis,* 461 F.Supp. at 853. JCAH standards can be expected to demand more in many circumstances than due process would tolerate. *Id.*

The exact contours of a due process right to care and treatment have not been defined. Whether the State has failed in its duty toward one patient, in one institution, or on a State-wide basis is essentially a factual question. *See, e.g., Davis v. Watkins,* 384 F.Supp. 1196 (1974), *supplemented sub nom. Davis v. Balson,* 461 F.Supp. 842 (1978), *supplemented sub nom. Davis v. Hubbard,* 506 F.Supp. 915 (N.D.Ohio 1980) (three-judge court). Plaintiffs have yet to come forward with any articulation of what they believe due process to mandate, other than to repeat the unsupportable position that the State is required to expend the same dollar amount as does the private sector. *See* Plaintiffs' Amended Complaint at 5, 7; Birnbaum Affirmation at 20; discussed *supra.* They have alleged no facts which demonstrate that the State care and treatment is inadequate, but merely demand immediate relief whenever the JCAH, a private organization, finds that a State facility is not meeting optimum operating standards. They decry "unnecessary . . . morbidity and mortality," *e.g.,* Birnbaum Affirmation at 1, but they fail to show that, after years of discovery, they are prepared to link the conceded unfortunate illness and death found in mental hospitals with inadequacies of a constitutional dimension.

▮ Loss of JCAH accreditation may signal operational inadequacies sufficient to warrant further judicial inquiry into possible due process violations. Plaintiffs' implied motion for partial summary judgment on the issue of whether loss of JCAH accreditation *per se* necessitates a finding of a denial of due process rights must, however, be denied, and partial summary judgment must be granted to defendants. Furthermore, as noted, plaintiffs have brought on injunctive motions to close various State hospitals alleging imminent due process deprivations. To the extent that those motions rest on the contention that loss of JCAH accreditation or HHS certification is a *per se* denial of due process, or on the assertion that the State is constitutionally mandated to expend the same dollar amount on a mental patient as does the private sector, those motions are denied as precluded by this grant of partial summary judgment.

*Equal Protection Clause*

In addition to their broad due process contentions, plaintiffs have further attempted to support their preliminary injunction motions on equal protection grounds. Plaintiffs assert that involuntarily committed mental patients are invariably confined to State institutions, while voluntarily committed mental patients are admitted to better equipped private institutions. They state that involuntarily committed individuals are more often less wealthy and members of racial minorities, and, there-

fore, they allege that the confinement of the involuntarily committed in State institutions violates the equal protection clause. Plaintiffs have argued that the Court should halt admissions to State psychiatric centers because to continue such admissions is "to invidiously segregate [plaintiffs] in an inadequate, separate, unequal and inferior lower tier of a two-tier New York mental hospital system." Plaintiffs' Papers in Opposition to Defendants' Motion for Summary Judgment, at 2 (E.D.N.Y., filed in chambers on November 2, 1982).

In *Union Carbide Agricultural Products Co. v. Costle,* 632 F.2d 1014, 1017 (2d Cir.1980), the Second Circuit held:

"Before a preliminary injunction will be granted in this Circuit, it must pass one of two tests. Both require a showing of irreparable harm. One requires in addition that the moving party show a likelihood of success on the merits. The other requires that there be sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly towards the moving party."

For the reasons that follow, this Court holds that plaintiffs' injunctive motions cannot meet either test. Plaintiffs must fail under either test because they have failed to state a cognizable equal protection claim.

As this Court has repeatedly noted, central to plaintiffs' equal protection claim is a showing by plaintiffs that the State is discriminating among similarly situated mental patients. *E.g., Woe,* 408 F.Supp. at 429, discussed *supra.* Upon reviewing MHL's statutory criteria for voluntary and involuntary treatment, this Court concludes that the two patient groups are, quite simply, not similarly situated. The involuntarily committed patient presents different and greater care and treatment concerns to the State, and ultimately to the institution in which he is confined, than does the less ill voluntary patient. These statutory distinctions also supply the obvious rational basis for the State's action.

MHL provides a comprehensive system for the hospital admission of the mentally ill. This Court in its recent opinion in *Project Release v. Prevost,* 551 F.Supp. at 1300, had occasion to outline the standards and procedures for voluntary and involuntary commitment:

" '[A]ny suitable person in need of care and treatment' may be admitted as a voluntarily committed mental patient upon that person's voluntary, written application. MHL § 9.13. '[P]erson in need of care and treatment' is defined as someone who 'has a mental illness for which in-patient care and treatment in a hospital is appropriate.' MHL § 9.01. To be found 'suitable,' a patient must be aware that he is applying to a mental hospital, and must understand the consequences of voluntary commitment; especially, the patient must comprehend the limitations governing release and the possibility that his status may be converted to involuntary commitment. MHL § 9.17(a).

\*    \*    \*    \*    \*    \*

"A person 'alleged to be mentally ill and in need of involuntary care and treatment' may be a candidate for involuntary commitment. MHL § 9.27(a). Someone 'in need of involuntary care and treatment' is a person who 'has a mental illness for which care and treatment in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment.' MHL § 9.01.

\*    \*    \*    \*    \*    \*

"An involuntary commitment may also result if a director of community services or his designated physician certifies that an individual 'has an illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.' MHL § 9.37(a)."

By statutory definition, a person made subject to involuntary commitment must suffer from mental illness to a substantially more serious degree than does a person eligible for voluntary treatment. A volun-

tary patient must appreciate the nature and consequences of his commitment; in contrast, an involuntarily committed patient's confinement is conditional upon his inability to comprehend the nature of his illness and his need for treatment. Furthermore, in *Project Release,* 551 F.Supp. at 1301, this Court additionally found that MHL permits involuntary commitment when and only when a patient has been shown to be unable to survive safely without hospital care and treatment or when he poses a manifest danger to himself or others. These criteria anticipate an individual who is far more ill than those patients capable of voluntarily committing themselves.

The differences in patient needs were noted by the three-judge district court in *Legion* in their holding that a federal statute providing Medicaid and Medicare payments to some mental patients but not to others was not violative of the equal protection clause. 354 F.Supp. at 459. Plaintiffs in *Legion,* who incidentally are represented by the same counsel as the plaintiff class in the instant case, had alleged that the patients denied benefits were more likely to be poor blacks. The court rejected the significance of this argument, stating:

"They offer in support of this contention a bare statistical argument included in their brief, but they present no proof of a racially discriminatory motive on the part of Congress and no proof of invidious discrimination. We are sympathetic with Justice Marshall's caveat—that 'at some point a showing that state action has a devastating impact on the lives of minority racial groups must be relevant,' [*Jefferson v. Hackney*] 406 U.S. [535] at 575, 92 S.Ct. [1724] at 1745 [32 L.Ed.2d 285 (1972)] (dissenting opinion); nevertheless, the majority opinion in *Hackney, supra,* has dictated that 'the standard of judicial review is not altered because of appellants' unproved allegations of racial discrimination.' 406 U.S. at 547, 92 S.Ct. at 1732. Here, the challenged legislation distinguishes between medically indigent persons who require short-term care and those who require long-term care, and does not on its face discriminate against blacks or poor persons. We cannot, therefore, conclude that a patently invidious discrimination evolves from this classification." *Id.*

Similarly, plaintiffs here have also done nothing more to support their allegations of a racially discriminatory motive than to point to the statistical data detailed in their amended complaint. The State commitment practices distinguish between voluntary and involuntary patients based upon the severity of their illnesses and the extent of their care and treatment needs. This Court has no reason to infer any invidiously discriminatory racial motivation from the nature of those practices.

This Court originally refused to dismiss plaintiffs' equal protection claim in *Woe,* 408 F.Supp. at 428–29, to afford them the opportunity to develop support for their contention that some mental patients received a lower level of care by the State than other similarly situated mental patients. After years of litigation, however, plaintiffs do no more now than repeat a patently insufficient allegation that the State is required to treat the involuntarily committed State patient in the same manner as the private sector treats the voluntary patient. Plaintiffs have thus not only failed to show that their equal protection claim is likely to succeed on the merits, they cannot show that their claim can succeed at all. Their equal protection claim is accordingly dismissed and their demands for injunctive relief denied.

*Class Status*

The complexion of this action has changed dramatically since Woe filed his complaint on June 27, 1975. Woe originally complained of conditions in one psychiatric center, and attributed the alleged inadequacies primarily to the lack of Medicaid funding. As the focus of the case shifted to address the alleged equal protection and due process violations which purportedly permeated the State system, the issues appeared to touch on the needs of a statewide class of plaintiffs. *See Woe,* 408 F.Supp. at 428–29. Recently, however, plaintiffs have

sought in this case a means of vindicating any alleged deficiency in care at each specific State facility.

 The JCAH accreditation criteria has been found to meet or exceed due process standards. Also, plaintiffs have alleged no facts sufficient to defeat a grant of summary judgment to defendants holding that all State facilities which are JCAH accredited are also in compliance with plaintiffs' due process rights. The only issue remaining in this action is whether a non-JCAH accredited facility can be found to have fallen below the standards of minimum care guaranteed by the due process clause. This issue turns on facts unique to a given facility, measured against minimum due process standards. Common questions concerning class members are therefore no longer present in this action.

The conclusion is inescapable that continued maintenance of this class action in its present form would not serve the purposes of Rule 23, F.R.Civ.P., and would embroil this Court in a clearly unmanageable monitoring of the entire State mental health system. Indeed, addressing due process violations in only one State mental hospital has involved courts in "considerable attention to the details of the operation" of a State facility. *New York Association for Retarded Children, Inc.,* 631 F.2d at 166 n. 3. A class action employed as a vehicle to vindicate alleged violations in every State facility in a system as extensive as New York's mental health program would needlessly burden a single district court and would not afford the parties the most effective relief.

Here, redress of rights for each facility within the State system was not contemplated either in the original amended complaint or in the grant of class certification. The amended complaint addressed only the alleged inadequacies of Kingsboro Psychiatric Center; nothing in the record indicates that Kingsboro has failed to be JCAH accredited throughout the pendency of this action.[7] At the time the class was certified,

at issue were broad allegations that State policy violated due process and equal protection rights. *Woe,* 408 F.Supp. at 428–29. Continuing this litigation to engage in a facility-by-facility due process analysis would simply require this Court to permit another implied amendment of the complaint. At some point a litigation has to end. In view of the Court's dismissal of all existing claims and related motions, that point has been reached here.

Accordingly, all original issues having been resolved, this class action is dismissed.

SO ORDERED.

---

**7.** In fact, the record demonstrates that all facilities within the Eastern District of New York are presently JCAH accredited. Errion Aff. at 25 and Exhibit F.