Walter WOE, by his Mother and Guardian, Wilma Woe, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

Mario CUOMO, individually and as Governor of New York; William Morris, individually and as Acting Commissioner of the Department of Mental Hygiene of the State of New York; Louis Smith, individually and as Director of Kingsboro Psychiatric Center, Defendants-Appellees.

No. 332, Docket 83–7269.

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1984.

Decided Feb. 22, 1984.

Morton Birnbaum, Brooklyn, N.Y., for plaintiffs-appellants.

Caren S. Brutten, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., N.Y., Melvyn R. Leventhal, John P. Petrila, Seth Abrams, New York City), for defendants-appellees.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Although some of the mysteries of mental illness have yet to be unravelled, the ability of modern psychiatry to "minister to a mind diseased" [1] has expanded dramatically in recent years. Through the use of psychotropic drugs and new methods of therapy, psychiatrists and other mental health workers can help their patients to lead more productive lives relatively free from the debilitating effects of mental disturbance. Yet the tragic reality is that society's allocation of its finite resources often prevents the medical profession from bringing its full expertise to bear in combatting psychic afflictions. Revelations that emerged in the Wyatt litigation in Alabama and the Willowbrook case in New York, among others, have forced us to acknowledge that institutions for the mentally handicapped often do not provide treatment that remotely accords with contemporary medical standards.

Courts have long recognized that the due process clause of the Fourteenth Amendment does not permit states to deprive mentally ill individuals of their freedom for therapeutic purposes unless some level of treatment is actually provided. We are confronted in this case with a broad challenge to the constitutional adequacy of treatment provided to persons civilly committed to New York State mental institutions. Although fully cognizant of the critical importance of the rights appellants seek to vindicate in this action, we are nevertheless persuaded that the district court was correct in holding that appellants had failed to assert an adequate factual basis for many of their claims. At the same time, we believe that the dismissal of certain claims was premature. According-

1. W. Shakespeare, *Macbeth,* Act V, scene iii.

ly, we remand so that appellants may have an opportunity to document the constitutional defects they allege.

## I

We shall attempt to review the nine-year history of this litigation in a concise manner. In a pseudonymous complaint filed in 1975, Walter Woe claimed that, as one involuntarily committed to Brooklyn State Hospital (now renamed Kingsboro Psychiatric Center), he was being denied that quality of care and treatment which the Constitution required. He contended that the state institution in which he resided was providing care which was grossly inferior to that offered by private hospitals, and, in particular, by Downstate Medical Center situated directly across from Kingsboro. He also asserted that individuals committed to state institutions were more likely to be poor, black, and more seriously ill than those treated in the psychiatric wards of general hospitals. He claimed that, as a *quid pro quo* for involuntary commitment, he was "constitutionally entitled to adequate and active care and treatment, either in a state mental hospital or in an alternative facility." Additionally, he argued that the level of care provided by general medical hospitals was the standard which the Constitution mandated, and the guideline by which his own care should be evaluated.

Woe also challenged the constitutionality of the New York Mental Hygiene Law (hereinafter "NYMHL") on its face and as applied, claiming that it failed to provide for State recognition and enforcement of his care and treatment rights. He also attacked disparities in the provision of Medicaid benefits to patients in private and state-administered mental hospitals, a claim no longer at issue here. Woe brought his complaint on behalf of a putative class of all similarly situated mental patients, and sought declaratory, injunctive and compensatory relief.

In his first order entered on a motion to dismiss, Judge Neaher carefully attempted to refine and focus the multiple issues raised by Woe. *Woe v. Mathews*, 408 F.Supp. 419 (E.D.N.Y.1976). He held that the Medicaid claim was foreclosed by the Supreme Court's summary affirmance of *Legion v. Richardson*, 354 F.Supp. 456 (S.D.N.Y.), *aff'd sub nom. Legion v. Weinberger*, 414 U.S. 1058, 94 S.Ct. 564, 38 L.Ed.2d 465 (1973), in which a virtually identical claim was rejected. He also upheld the constitutionality of the NYMHL, concluding that it did provide a satisfactory right to treatment and mechanisms for enforcing that right.[2] The judge then discussed appellants' constitutional claims, which he viewed as two-fold. He reasoned that when a state assumes "the burden of providing care for a dependent group, such as the mentally ill, it cannot consonant with the equal protection clause discriminate among those similarly situated mentally ill." 408 F.Supp. at 428. In addition, as a matter of due process, "it would seem encumbent upon the State as confiner to minimize the mode of confinement, and to employ whatever means are necessary, including such care and treatment as are reasonably possible in the circumstances of the case, to promote the speedy release and return to liberty of the person confined." *Id.* at 429 (citation omitted).

Judge Neaher concluded that these claims could not be summarily determined. He decided that maintenance of the suit as a class action would assure that class representatives would exist both at the initiation and the ultimate disposition of the suit.[3] Because Woe's interests were repre-

---

2. Judge Neaher later entered a Rule 54(b) certification as to the Medicaid claim against the federal defendants, and an appeal was taken to this court, which affirmed. 562 F.2d 40 (2d Cir.1977). No certification was made on the state law claim, which therefore remains part of this appeal.

3. On March 18, 1977, the federal defendants filed a "Suggestion of Death" with the Court, in which they sought dismissal of the action by reason of Woe's death. Appellants submitted an autopsy report indicating that the cause of death was an overdose of psychotropic medication. Because the class had already been certified, the

sentative of those of the proffered class, the judge certified pursuant to Fed.R. Civ.P. 23(b)(2) a class consisting of "all persons between the ages of 21 and 65 who are or who will be involuntarily civilly committed to New York State mental institutions." *Id.* Finally, several motions to add additional plaintiffs and defendants and to join new causes of action were denied. Most relevant to the current status of the action were the denials of a motion to add as defendants an organization called the Joint Commission on Accreditation of Hospitals (hereinafter "JCAH") and certain of its officers and directors, and a motion to join a new claim alleging conspiracy by the JCAH and government defendants to violate plaintiffs' civil rights. The latter claim was predicated upon the theory that the JCAH uses lower accreditation standards in evaluating public than non-public mental hospitals, resulting in approval of substandard state institutions. That issue, the judge suggested, could be better examined in a separate action.[4]

Both parties sought to challenge the class as certified. Plaintiffs moved to enlarge it by removing the age restrictions, while defendants moved to limit the class to those patients committed to Kingsboro Psychiatric Center. In an unpublished order the following year, *Woe v. Mathews,* 75 CV 1029 (E.D.N.Y. Jan. 13), *aff'd by order,* 562 F.2d 40 (2d Cir.1977), Judge Neaher denied both motions "pending clarification of the issues which will form the essence of the action as discovery progresses." *Id.,* slip op. at 6.

No further progress appears to have occurred for three years. In February 1980, appellants moved for a preliminary injunction barring further admissions to Kings Park Psychiatric Center, which had lost its JCAH accreditation. Appellants subsequently sought similar relief with respect

to Hudson River Psychiatric Center, whose accreditation had also been revoked.

The parties and the judge held a status conference on May 14, 1980. At that session, the judge broached the possibility of appointing a panel of *amici* to assist the court in examining the state institutions and formulating constitutional standards of care and treatment. The judge noted that this procedure had been utilized with success by Judge Johnson in handling a challenge to the Alabama mental hospitalization system, *Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1971), *implemented in* 344 F.Supp. 373 (1972), *aff'd sub nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974). He indicated particular interest in the participation of the Department of Justice in the litigation, and noted that the recently-enacted Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 (Supp. IV 1980), afforded that Department a special role in protecting the rights of residents of state institutions. Appellees, however, objected to the *amici* procedure, and indicated that if the judge intended to pursue it, they would seek certification under 28 U.S.C. § 1292(b) to allow an immediate appeal. For reasons which do not appear in the record, the proposal was never pursued.

A period of squabbling between the parties over discovery matters ensued, during which the substantive aspects of the litigation remained at a standstill. During that period both Kings Park and Hudson River Psychiatric Centers regained their accreditation. On May 24, 1982, appellees moved for summary judgment. Appellants responded with another order to show cause, this time relating to Manhattan Psychiatric Center, which had lost its JCAH accreditation, and South Beach Psychiatric Center, which had lost its certification by the Department of Health and Human Services (hereinafter "HHS") as a hospital providing

---

action proceeded despite the death of the named plaintiff.

**4.** Appellants also sought to add a new class of plaintiffs represented by Frank Foe. This class would have asserted the unconstitutionality of the federal requirement that JCAH accreditation

of mental hospitals serve as a condition precedent to patients' eligibility for certain Supplemental Security Income benefits. *Woe v. Mathews, supra,* 408 F.Supp. at 430–31. Joinder of that claim was denied.

adequate care. The court indicated by memorandum order that it would not entertain the request because it was "redundant of issues to be determined in motions already before this Court," *Woe v. Carey*, 75 CV 1029 (E.D.N.Y. Nov. 2, 1982), but would instead treat appellants' papers as opposing the motion for summary judgment.

On May 16, 1983, Judge Neaher ruled on appellees' motion. *Woe v. Cuomo*, 559 F.Supp. 1158 (E.D.N.Y.1983). He interpreted the Supreme Court's recent decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), to require that the judgment of psychiatric professionals related to institutional care and treatment be accorded presumptive validity. After discussing the JCAH accreditation program, he concluded that it represented the exercise of professional judgment about a facility which, under *Youngberg,* constituted *prima facie* proof of adequacy. As to the accredited state facilities, he found that appellants had failed to present any data indicating that JCAH approval was "a mere 'veil' hiding due process violations." 559 F.Supp. at 1165. Accordingly, appellants' claim failed as to the accredited facilities.

Nor, the judge reasoned, does loss of accreditation *per se* necessitate a finding of due process violation, because JCAH standards seek to insure more than the minimal adequacy required by the Constitution under *Youngberg.* Moreover, he found no articulation by appellants of a standard to which JCAH norms could be compared to determine their conformity with constitutional requirements. Appellants therefore, he held, could not make a showing of liability based solely on non-accreditation.

As to the equal protection claims, the judge concluded that the state did not invidiously discriminate among similarly-situated individuals. Patients in state mental institutions, appellants conceded, tended to be involuntarily committed, while patients treated in private hospitals were uniformly present there on voluntary status. The statutory criteria for involuntary commitment, as Judge Neaher construed them,

"anticipate an individual who is far more ill than those patients capable of voluntarily committing themselves." 559 F.Supp. at 1168. Appellants, the judge held, also failed to make the requisite showing of motive to support a claim of racial discrimination under the equal protection clause.

This left only one issue before the court: appellants' claim that, as to a particular state institution, loss of accreditation and/or certification might signal inadequacies so great as to amount to a constitutional violation. This "issue turns on facts unique to a given facility," the judge decided, and "[c]ommon questions concerning class members are therefore no longer present in this action." *Id.* at 1169. A class action so conceived would "embroil this Court in a clearly unmanageable monitoring of the entire State mental health system." *Id.* Rather than assume such a burden which "was not contemplated ... in the grant of class certification," the judge held that the "dismissal of all existing claims and related motions" compelled the dismissal of the action *in toto,* and so granted appellees' summary judgment motion. Woe appeals.

II

Appellants invoke several different legal theories in support of their claim that the State is depriving them of their right to adequate care and treatment. We shall consider their claims *seriatim,* and then proceed to resolve peripheral matters raised in this litigation.

A. *Constitutionality of Mental Health Law*

Our court has recently upheld the NYMHL against a procedural due process challenge to the standards for voluntary, involuntary and emergency civil commitment under that law. *Project Release v. Prevost,* 722 F.2d 960 (2d Cir.1983). Appellants' challenge here carries the argument a step further. They allege that the New York civil commitment statutes are unconstitutional "because they only examine who should be committed and how one should

be committed. They [do] not require, *quid pro quo*, that adequate care be given the patient after involuntary civil commitment."

■ Contrary to appellants' assertions, however, the NYMHL explicitly provides a right to care and treatment for institutionalized mental patients. § 33.03(a), appropriately captioned "Quality of Care and Treatment," states:

Each patient in a facility and each person receiving services for mental disability shall receive care and treatment that is suited to his needs and skillfully, safely, and humanely administered with full respect for his dignity and personal integrity.

State regulations elaborate upon the requirements of this section, providing *inter alia* for individual service plans for each patient, nondiscriminatory treatment, an appropriate physical environment, and suitable medical care. *See* 14 N.Y.C.R.R. Part 27.

Nor is this statutory right merely precatory. The NYMHL vests responsibility for insuring that patients receive statutorily-mandated care at several levels within the administrative hierarchy. The director of each state mental health facility must "require the development of a written treatment plan to assure adequate care and treatment for each patient." NYMHL § 29.13(a). The State Office of Mental Health is charged with the duty of

seeing that mentally ill persons are provided with care and treatment, that such care, treatment and rehabilitation is of high quality and effectiveness, and that the personal and civil rights of persons receiving care, treatment and rehabilitation are adequately protected.

NYMHL § 7.07. And § 31.19 of the NYMHL requires the Commissioner of Mental Health, whenever he has reason to believe that the rights of institutionalized patients are being violated, to "issue an order directed to the person who has committed the violation directing him to cease and desist." If this is unsuccessful, the Commissioner may seek an injunction or temporary restraining order from the New York Supreme Court barring the offending conduct.

The power to enforce treatment rights does not rest solely within the state government. An individual who believes his statutory rights have been violated may seek to compel lawful action by means of a proceeding under Article 78 of the New York Civil Practice Law. Or, he may attempt to compel his release from a state institution through habeas corpus. NYMHL § 33.15. In addition, the state regulations establish a procedure whereby a patient may object to a specific treatment decision. 14 N.Y.C.R.R. § 27.8. This procedure was found to conform to constitutional requirements in *Project Release v. Prevost, supra*, 722 F.2d at 980–81.

■ The NYMHL thus does provide, on its face, for a right to care and treatment for civilly committed residents of state mental institutions. Appellants also charge that the law is invalid as applied. To the extent this suggests that state officials are failing to comply with the state's own treatment requirements, we are foreclosed from entertaining the claim by the Supreme Court's second decision in *Pennhurst State School and Hospital v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). *Pennhurst II* held that the Eleventh Amendment bars a federal court from ordering a state official to conform his conduct to state law. Alternatively, to the extent appellants mean to suggest that state action is consistent with its own law yet in violation of the Federal Constitution, that issue is subsumed by appellants' other constitutional claims, to which we now turn.

### B. *Equal protection claims*

Although the claims have evolved as this litigation has haltingly progressed towards its present status, the thrust of appellants' complaint has been the disparity between the quality of care furnished to the mentally ill in general hospital psychiatric wards, and that offered by state mental institu-

tions. They allege as much as a tenfold differential in per diem/per patient expenditures between the two types of institutions in the state. They also cite statistics demonstrating that, while large numbers of voluntarily hospitalized patients are treated in state institutions, general hospitals do not treat patients who are involuntarily civilly committed.

Based upon these data, appellants claim that those who receive inferior state treatment are, generally, more seriously ill, poorer, and more likely to be black than those cared for in non-state hospitals. This "two-tier system," they urge, amounts to invidious discrimination in violation of the equal protection clause of the Fourteenth Amendment.

■■■ A statutory classification scheme does not, however, violate equal protection so long as it is rationally related to a legitimate governmental purpose and does not impinge upon a "suspect" class or a fundamental constitutional right. *Harris v. McRae,* 448 U.S. 297, 322–23, 100 S.Ct. 2671, 2690–91, 65 L.Ed.2d 784 (1980); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 16–17, 93 S.Ct. 1278, 1287–1288, 36 L.Ed.2d 16 (1973). After setting forth the NYMHL requirements for voluntary and involuntary commitment,[5] Judge Neaher concluded:

The involuntarily committed patient presents different and greater care and treatment concerns to the State, and ultimately to the institution in which he is confined, than does the less ill voluntary patient. These statutory distinctions also supply the obvious rational basis for the State's action.

*Woe v. Cuomo, supra,* 559 F.Supp. at 1167. It is not necessarily the case that every involuntarily committed patient is more seriously ill than his voluntary counterpart; rather, the illnesses may be equally grave, but the involuntary patient may be unwilling to accept the liberty constraints which would accompany institutionalization, voluntary or involuntary. Nevertheless, the state has, as the judge found, rationally distinguished among mental patients based upon the severity of their condition and the type of treatment which is appropriate. The statutory dichotomy, it is true, may not guarantee in every case that patients similarly situated as to mental illness will be treated identically.[6] But otherwise valid classifications are not undermined by imperfections of this sort. *See Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

■■■ The level of scrutiny we must apply in this context is not heightened by appellants' suggestion that the New York commitment laws discriminate on the basis of wealth and race. The Supreme Court has consistently held that poverty without more is not a suspect classification. *Har-*

---

**5.** We have previously analyzed these requirements in *Project Release v. Prevost, supra,* 722 F.2d at 965–66. In brief, voluntary hospitalization requires that a person have a "mental illness for which in-patient care and treatment in a hospital is appropriate." NYMHL § 9.01. Involuntary commitment is possible under three circumstances. The individual must have (1) "a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment," *id.* §§ 9.27(a), 9.01; (2) "a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others," *id.* § 9.37(a); or (3) "a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others," *id.* § 9.39(a).

**6.** Judge Neaher somewhat overstated the statutory distinction between voluntarily and involuntarily committed individuals: "A voluntary patient must appreciate the nature and consequences of his commitment; in contrast, an involuntarily committed patient's confinement is conditioned upon his inability to comprehend the nature of his illness and his need for treatment." *Woe v. Cuomo, supra,* 559 F.Supp. at 1168–69. He is certainly correct as to persons involuntarily committed pursuant to NYMHL § 9.27(a), *see* note 5 *supra.* However, a person involuntarily committed pursuant to § 9.37 or 9.39 may resist institutionalization for reasons other than lack of comprehension of his need for treatment, which is not a statutory requirement for commitment under those subsections.

*ris v. McRae, supra,* 448 U.S. at 323, 100 S.Ct. at 2691; *see James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). Appellants have not alleged that the statutory scheme discriminates against a definable class of indigent persons, or that poverty has resulted in an absolute deprivation of a government benefit. *See San Antonio Independent School District v. Rodriguez, supra,* 411 U.S. at 22–25, 93 S.Ct. at 1290–1292. Nor have they made, or attempted to make, the showing of racially discriminatory motive necessary to justify stricter scrutiny on that ground. *See Mobile v. Bolden,* 446 U.S. 55, 62–65, 100 S.Ct. 1490, 1497–1499, 64 L.Ed.2d 47 (1980); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1975); *Legion v. Richardson, supra,* 354 F.Supp. at 459.

That appellants have attempted to highlight important inequities in the system of care and treatment for the mentally ill, we have no doubt. Under the precedents by which we are bound, however, their claims simply are not cognizable as equal protection violations. We therefore move on to the more troubling aspect of the case: the alleged violation of the due process right to treatment.

## C. *Due process claims*

Appellants argue that when an individual is involuntarily committed to a mental institution, the state has an obligation to provide care and treatment adequate to allow that individual to improve his health and regain his liberty. They offer five standards by which the constitutional inadequacy of care may be gauged: (1) JCAH non-accreditation, (2) HHS non-certification, (3) reports of scandalous care by the media, other professionals, etc., (4) the level of care provided by general hospital inpatient psychiatric facilities, and (5) commitment to the lower tier of the alleged "two-tier" system of mental health care. By any of these measures, they submit, appellants are being deprived of due process protection by being forced to accept inadequate treatment.

### 1. *The Right to Treatment*

■ This court suggested some years ago that a constitutional right to treatment might well be an essential condition of the state's power of involuntary commitment. *Schuster v. Herold,* 410 F.2d 1071, 1087–89 (2d Cir.), *cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969). Since then, numerous federal courts have acknowledged the existence of such a right. *See, e.g., Scott v. Plante,* 641 F.2d 117 (3d Cir. 1981), *vacated and remanded,* 458 U.S. 1101, 102 S.Ct. 3474, 73 L.Ed.2d 1362, *on remand,* 691 F.2d 634 (3d Cir.1982); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn. 1974), *partially vacated on other grounds,* 550 F.2d 1122 (8th Cir.1977); *Wyatt v. Stickney, supra; Davis v. Watkins,* 384 F.Supp. 1196 (1974), *supplemented sub nom. Davis v. Balson,* 461 F.Supp. 842 (1978), *supplemented sub nom. Davis v. Hubbard,* 506 F.Supp. 915 (N.D.Ohio 1980); *cf. Birnbaum, The Right to Treatment,* 46 A.B.A.J. 499 (1960). The recognition of the right to treatment has been based upon several different grounds.[7] At bottom,

---

**7.** Some courts have reasoned that, because treatment is a major if not the only legitimate purpose for involuntary commitment, committed individuals must be given treatment which has a realistic possibility of improving their condition. *See, e.g., Welsch v. Likins, supra; Wyatt v. Stickney, supra.* Others have suggested that treatment is an essential *quid pro quo* because involuntary commitment does not require the rigorous procedural safeguards associated with criminal conviction, yet may result in an equally great deprivation of liberty. *See, e.g., Harper v. Cserr,* 544 F.2d 1121 (1st Cir.1976). Finally, by analogy to the First Amendment analysis of *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct.

247, 252, 5 L.Ed.2d 231 (1960), courts have required that a treatment program be the "least restrictive alternative" available for a particular individual. *Rennie v. Klein,* 653 F.2d 836 (3d Cir.1981) (en banc), *vacated and remanded,* 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *on remand,* 720 F.2d 266 (1983). It is unclear to what extent any or all of these approaches retains vitality in light of the Supreme Court's recent decision in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), discussed *infra.* For differing views on that point, *see Rennie v. Klein, supra,* 720 F.2d at 268, 271 (Adams, J., concurring in the result), and 275–77 (Weis, J., concurring).

however, courts have acknowledged that the "massive curtailment of liberty" associated with involuntary confinement, *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), dictates that the "nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). If the justification for commitment rests, even in part, upon the need for care and treatment, as it does under New York law, *see* NYMHL §§ 9.01, 9.27(a), 9.37(a), then a State which commits must also treat.

The Supreme Court has not directly addressed ·the question whether a constitutional right to treatment exists. *See, e.g., Pennhurst State School and Hospital v. Halderman (Pennhurst I),* 451 U.S. 1, 31, 101 S.Ct. 1531, 1547, 67 L.Ed.2d 694 (1981); *O'Connor v. Donaldson,* 422 U.S. 563, 573, 95 S.Ct. 2486, 2492, 45 L.Ed.2d 396 (1975). In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), however, the Court did resolve a claim involving an institutionalized mentally retarded individual's right to habilitation—that is, to "training and development of needed skills." *Id.* at 317, 102 S.Ct. at 2459. While the *Youngberg* Court refrained from deciding the existence of a right to treatment *per se, see id.* at 325–27, 102 S.Ct. at 2463–64 (Blackmun, J., concurring), its analysis can assist us in charting our course through the rough terrain of this case.[8]

*Youngberg* involved an individual action by a mentally retarded resident of Pennhurst who claimed injury due to his own behavior, attacks by others, and excessive physical restraint by the staff. He assert-

ed, and the Third Circuit agreed, that he possessed Fourteenth Amendment rights to safety, freedom of movement and training. Because the resident, Romeo, was so profoundly retarded that there was no realistic possibility of his ever leaving the institution, the Supreme Court addressed his right to training only to the extent necessary to protect his liberty interests in personal security and freedom from restraint. It held that the State was obligated to provide "minimally adequate or reasonable training" appropriate to Romeo's particular needs. *Id.* at 319, 102 S.Ct. at 2460.

In determining the reasonableness of training provided by an institution, the Supreme Court said, "courts must show deference to the judgment exercised by. a qualified professional." *Id.* at 322, 102 S.Ct. at 2461. The majority elaborated:

> ... the [training] decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462. The question suggested by *Youngberg,* then, is not what treatment was actually provided, but whether the treatment decision was professionally made and falls within the scope of professional acceptability.[9]

With this formulation in hand, we can now return to the case at bar. Three of appellants' five proffered standards do not retain any viability under the *Youngberg* analysis. Standards (4) and (5) both turn on the disparity in quality of care between what appellants have dubbed "upper tier"

---

**8.** *Youngberg* was evidently not to be confined to its facts. *Rennie v. Klein, supra,* dealing with the right of involuntarily committed mental patients to refuse medication, was remanded for reconsideration in light of *Youngberg.* So was *Scott v. Plante, supra,* which involved claims of inadequate and overly-restrictive treatment. Just how broadly *Youngberg* is to be interpreted, however, remains an open question. *See Doe v. New York City Dept. of Social Services,* 709 F.2d 782, 789–90 (2d Cir.1983).

**9.** The Supreme Court has emphasized deference to the judgment of psychological professionals in prior cases. *See, e.g., Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). For a critique of this approach, *see* "The Supreme Court, 1981 Term," 96 *Harv.L.Rev.* 62, 84–86 (1982).

general hospitals and "lower tier" state mental institutions. Assuming the alleged divergence exists, it does not bear on the question whether treatment by the latter is actually informed by professional judgment. Nor do media reports provide any systematic enlightenment in that respect, as standard (3) would suggest. Disapproval by JCAH and HHS, however, upon which standards (1) and (2) are predicated, does come closer to the mark.

The court below held that "JCAH accreditation criteria comport with or exceed due process requirements, and that JCAH accreditation is *prima facie* proof of adequate care." *Woe v. Cuomo, supra,* 559 F.Supp. at 1162. We agree that JCAH approval represents an "exercise of professional judgment" to which we must defer under *Youngberg.* This is true not solely because, as the district court stated, "JCAH is a highly respected organization of psychiatric and medical professionals, and the value of its accreditation program has been recognized by Congress and the courts." *Id.* at 1164. It also has merit because many of the JCAH criteria bear directly on the likelihood that professional judgments will govern individual treatment decisions within the institution. JCAH standards address the existence, quality and specificity of patient treatment plans. They require clear procedures for the use of drug and other therapies, including written approval by a physician. They examine the availability of medical care in all respects, and the manner in which it is provided. The JCAH process thus seeks to assure that the facility itself is structured so that decisions will be professionally made.[10]

We agree with appellants and the district court that JCAH accreditation is merely *prima facie* proof of adequacy, and that a court is not barred from probing behind it if presented with evidence that JCAH has, across-the-board or in a given instance, allowed its standards to slip below constitutional benchmarks. *Youngberg* did not suggest that the judgment of the state's professionals was necessarily conclusive. On the contrary, the Court indicated that the testimony of Romeo's experts should have been admitted as relevant to the professional acceptability of the training he was receiving. *Youngberg, supra,* 457 U.S. at 323 n. 31, 102 S.Ct. at 2462 n. 31. Thus, on a proper showing, a court should be prepared to allow inquiry into the adequacy of treatment even at an accredited facility.

After scrutinizing this record, we find that appellants have made such a showing with respect to only one institution, South Beach Psychiatric Center. South Beach, although JCAH-accredited, lost its HHS certification in 1982.[11] The monitoring team's report which led to this action indicated numerous deficiencies which go directly to the "professional judgment" standard. A few excerpts will demonstrate: "Psychological evaluations ... were conspicuously absent ... Individual comprehensive treatment plans (ITP) were absent ... drug interactions were not adequately monitored ... nurses were administering medications from unclear physicians' orders ..." This survey was performed by a team of consultants recommended by the National Institute of Mental Health, and rebuts the presumption of adequacy which JCAH approval carries. Given these conflicting evaluations, we are

---

**10.** *Cf. Society for Good Will to Retarded Children v. Cuomo,* 572 F.Supp. 1300, 1345 (E.D.N.Y.1983) ("Lack of personnel capable of exercising professional judgment in many individual cases itself represents a failure to provide constitutionally safe conditions.")

**11.** We must respectfully disagree with the district judge that "because HHS certification itself is dependent upon JCAH accreditation, 42 U.S.C. § 1395x(f), it is unnecessary to reach the issues concerning loss of HHS certification." *Woe v. Cuomo, supra,* 559 F.Supp. at 1159. While the statement is superficially true, the Secretary of HHS also is statutorily authorized to decertify even a JCAH-accredited facility, if his own survey indicates "significant deficiencies." 42 U.S.C. § 1395bb(b) (1976). Thus, loss of HHS certification may signal inadequate institutional conditions even where JCAH accreditation is in order.

compelled to conclude that the district judge erred in deciding, on a summary judgment motion, that appellants had failed to raise genuine issues of material fact as to the inadequacy of care at South Beach. Fed.R.Civ.P. 56; *see Schering Corp. v. Home Insurance Co.,* 712 F.2d 4 (2d Cir. 1983), and cases cited therein.

Of course, where a facility lacks accreditation by JCAH, not even a prima facie showing of adequacy exists. At oral argument, the parties agreed that the other target of appellants' October 1982 motion, Manhattan Psychiatric Center, has since regained its accreditation. They also stated that Mid-Hudson Psychiatric Center, at least some proportion of whose residents are class members, had lost JCAH approval. Appellants claim that appellees failed to inform them or the district court of this fact. In any event, we believe the entry of summary judgment, denying appellants an opportunity to prove their allegations, would be inappropriate as to that or any other institution losing accreditation or approval prior to final judgment.

### 2. *Appropriateness of Class Action*

The maintenance of this action as it would now be constituted, however, depends upon the issue of class certification. Judge Neaher, noting that the "complexion of this action has changed dramatically" since it originated, determined that the class he had originally certified was no longer viable. He acknowledged that the issue "whether a non-JCAH accredited facility can be found to have fallen below the standards of minimum care guaranteed by the due process clause" was still outstanding, *Woe v. Cuomo, supra,* 559 F.Supp. at 1169. Yet finding the action now "clearly unmanageable," *id.,* he decertified the class and, since no litigating party remained, dismissed the action in its entirety.

We find it odd that, having initially certified a massive class representing present and future individuals committed to all state institutions, the judge should now object to the scaled-down version of the litigation. Moreover, it is simply not the case that appellants "originally complained of conditions in one psychiatric center," *id.* at 1168; the focus of their complaint has been state-wide since its initiation. It is often proper, as we noted in *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), for a district court to view a class action liberally in the early stages of litigation, since the class can always be modified or subdivided as issues are refined for trial. Indeed, it is an extreme step to dismiss a suit simply by decertifying a class, where a "potentially proper class" exists and can easily be created. *See Ford v. United States Steel Corp.,* 638 F.2d 753, 760 (5th Cir.1981).

We are also concerned about possible prejudice to members of a class who failed or were unable to take independent steps to protect their rights precisely because they were members of the class. We note, for example, that the respondent in *Youngberg* was forced to drop his claims for injunctive relief prior to trial, because they were already pending in another class action relating to the facility in which he was housed. *Youngberg v. Romeo, supra,* 457 U.S. at 311, 102 S.Ct. at 2455. For the reasons we have attempted to articulate with some precision, we believe the district judge abused his discretion by decertifying the class.

On remand, subclasses should be certified as appropriate to press the outstanding claims we have identified. Without attempting to control the future course of this litigation, we would also suggest that the district judge consider employing more systematic methods of factfinding relating to the institutions still at issue. The services of a magistrate acting as special master might well expedite the proceedings. *See* Fed.R.Civ.P. 53. Discovery between the parties has done little to move the case forward until now, and the state has appeared reluctant to produce the primary material upon which appellants could construct their case. Placing the investigation under the aegis of the court and a magis-

trate might inure to the benefit of both parties.

In addition, we note that mental institutions within the New York State system have lost and regained accreditation even within the course of this litigation. We would expect, of course, that the district judge will reexamine the facts as they exist at the time he revises class certification and as they evolve thereafter. Our discussion of the implications of nonaccreditation and noncertification should serve as a guide in analyzing the status of the appellants' case with respect to all of the hospitals at issue.[12]

### III

Appellants' counsel also seeks an award of attorneys' fees for his efforts to date. Although we applaud his efforts on behalf of the unfortunate, forgotten, and all-too-often unrepresented members of the appellant class, we are barred from making an award in these circumstances. *See Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). In any event, we believe this issue is more appropriately left to the discretion of the conscientious district judge, who bears the primary burden of shepherding this litigation.

Accordingly, we affirm the judgment of the district court with respect to the state law and equal protection claims, and reverse and remand the right-to-treatment claim to the extent we have hitherto indicated.

**12.** Subsequent to oral argument, appellants have indicated to us that an additional hospital, Bronx Psychiatric Center, has lost accreditation. We leave consideration of that fact, if true, to the district judge on remand.