Paul L. GANN and Ruth Ann Gann, as Co-Administrators of the Estate of John E. Gann, and Paul L. Gann and Ruth Ann Gann, Individually, Plaintiffs,

v.

Patricia SCHRAMM, et al., Defendants.

Civ. A. No. 81–165 LON.

United States District Court,
D. Delaware.

April 18, 1985.

Bayard Marin of Marin and Hudson, Wilmington, Del., for plaintiffs.

Matthew J. Lynch, Jr. (argued), Michael F. Foster and Rhonda A. Hauge of Dept. of Justice, Wilmington, Del., for defendants Schramm, Schweidel, Feeney, Buckley, Tonogbanua, Ausejo and Craig.

Warren Burt, Wilmington, Del., for defendant Vergara.

## OPINION

LONGOBARDI, District Judge.

This is a civil rights action brought under 42 U.S.C. § 1983. The Plaintiffs, Paul L. Gann and Ruth Ann Gann, are suing in their representative capacities as co-administrators of the estate of their son, John E. Gann, and individually. They allege that the actions of the Defendants violated John Gann's rights under the due process and equal protection clauses of the United States Constitution. They seek damages, attorney's fees and costs. The Defendants claim they are entitled to summary judgment because the complaint does not allege a constitutional violation and, further, because they are entitled to official immunity.

## BACKGROUND

The action arises from John Gann's suicide of December 19, 1980, while he was a patient at the Delaware State Hospital.

John Gann had been involuntarily committed to the Delaware State Hospital ("DSH") on December 12, 1980. At that time, he had an extensive history of severe mental illness and had made what appeared to be several attempts on his life. In the two years prior to the December 12 admis-

sion, he had been twice admitted to DSH and had also spent time at the Governor Bacon Health Center.

Gann's admission on December 12, 1980, was based upon the recommendation of a doctor at the Wilmington Medical Center where Gann had been admitted after his mother found him with a plastic bag over his head suffering from the effects of sniffing glue. Upon admission, Gann was examined by Dr. Tonogbanua of the DSH staff who concluded that the effects of the glue made it difficult to assess Gann's mental condition. The doctor assigned Gann to the Admissions Ward and placed him on "close observation." He rejected the idea of putting Gann on the more restrictive "one to one" observation because he felt there was no indication Gann was a serious threat to himself. After this assessment, Dr. Tonogbanua did not treat John Gann during the remainder of his stay at DSH.

Two hours after his admission, Dr. Ausejo and Dr. Vergara, staff psychiatrists at DSH, observed Gann during their regular ward rounds. After reviewing Gann's records, the doctors continued Dr. Tonogbanua's recommendation of "close observation" for Gann. This recommendation was extended on December 15, 1980, after the two doctors examined Gann again. On December 16, Dr. Vergara, Dr. Ausejo and the rest of Gann's treatment team met to decide whether Gann should be committed to DSH. After offering Gann the opportunity for voluntary commitment, which he strongly opposed, the team elected to involuntarily commit him under the provisions of 16 *Del.C.* § 5003. The commitment was based upon the doctors' conclusion that Gann's "disease or condition poses a threat based upon manifest indications that the patient is likely to commit or suffer serious harm to himself if not given immediate hospital care and treatment."

At 10:00 p.m. on that same day, Gann escaped from the ward by picking the lock on the screen to his window. He was apprehended by a state policeman after a fifteen minute absence. Upon his return, he was strip searched for contraband and then examined by another staff doctor at DSH who ordered a sleeping pill for him.

The next morning, Dr. Ausejo and Dr. Vergara came to see Gann while on their morning rounds. He was still asleep and they decided not to wake him. Again, "one to one" observation was not instituted. His "close observation" status was continued. After a roll call that same evening, sometime after 9:00 p.m., John Gann was reported missing from the Admissions Ward. A search of the ward was instituted and Gann was not found.

On the morning of December 19 at approximately 5:00 a.m., John Gann was found dead in the closet of his room in the Admissions Ward. A plastic bag like the type used in the DSH kitchen was found over his head. The autopsy conducted by the Medical Examiner's Office revealed that the cause of death was asphyxia from the placement of a plastic bag over the head.

The Plaintiffs claim that this series of events violated their son's rights under the fourteenth amendment. In particular, the thrust of their complaint is that the whole incident as described above constituted a denial of John Gann's rights to safety and the security of his person while involuntarily committed to State care. They also contend that in light of Gann's propensity for harming himself, the Defendants' classification calling for only "close observation" amounted to a denial of equal protection. Apparently the claim is that people who threaten suicide should all be treated equally for security purposes and that such a situation requires "one to one" observation. The Defendants claim that no constitutional violation took place and that they are entitled to summary judgment. In considering the Defendants' motion, the Court is mindful of the well established standard for summary judgment. Summary judgment may only be granted if the record before the court shows that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The burden of proving that the standard has been met is on the moving

party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1976).

## EQUAL PROTECTION CLAIM

The Plaintiffs have alleged that the Defendants' actions violated John Gann's rights under the equal protection clause of the fourteenth amendment. The equal protection clause "is a pledge of the protection of equal laws", *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886), and "was intended as a restriction on state legislative action inconsistent with elemental constitutional premises." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The first step in any equal protection claim is to establish that a recognizable, distinct class is "singled out for different treatment under the laws as written or as applied." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977); *Wayte v. United States*, — U.S. —, — - — n. 10, 105 S.Ct. 1524, 1531–1532 n. 10, 84 L.Ed.2d 547 (1985). In the present case, the Plaintiffs have made no showing that Gann was a member of any "identifiable group" singled out for different treatment under the laws. They have not alleged that any state statute, regulation or practice has effected discrimination against a recognizable group of which their son is a member. They merely claim that actions of state employees on one particular occasion violated their son's constitutional right to a safe environment. Since the actions complained of were not taken pursuant to a classification embodied in state law or practice, equal protection analysis does not provide a framework for resolving the issue. Further, the equal protection clause does not require things which are different in fact to be treated in law as though they were the same. *Plyler v. Doe*, 457 U.S. at 216, 102 S.Ct. at 2394. The implicit suggestion in the Plaintiffs' argument is that the equal protection clause requires that all patients who threaten suicide deserve exactly the same intensity of medical observation regardless of the seriousness of the threat. Such a premise is patently unsound. The basis of the equal protection clause is that individuals who are similarly situated must not be treated differently. Yet, a function of medical diagnosis is to determine in what ways individuals are *not similarly situated* so that they can be treated accordingly. Such rationally based differentiation clearly does not violate the equal protection clause.

## DUE PROCESS CLAIM

The Plaintiffs also claim that the Defendants' actions violated the due process clause of the fourteenth amendment. For the purposes of this motion, the Court will assume the Plaintiffs are claiming only a violation of substantive due process since the specifics of a procedural due process claim have not been alluded to by the Plaintiffs. *See, Gann v. Delaware State Hosp.*, 543 F.Supp. 268, 273 n. 6 (D.Del.1982).

The analysis of claims under section 1983 alleging violations of the fourteenth amendment's due process clause commences with fundamentals established in a line of cases running from *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), through *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The statute itself reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

In essence, there are four prerequisites to constitute a valid claim under section 1983; that is, (1) the defendants must have acted under color of state law; (2) the conduct must have implicated a life, liberty or property interest; (3) a deprivation of

**1448**

the particular interest; and (4) the deprivation was without due process of law.

 The Defendants in this case are state employees who were at all pertinent times carrying out responsibilities within the scope of their employment. As such, their actions were under color of state law. *Monroe v. Pape*, 365 U.S. at 172–85, 81 S.Ct. at 476–83.

In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that the right to personal security is an " 'historic liberty interest' protected substantively by the Due Process Clause." *Id.* at 315, 102 S.Ct. at 2458. In this case, Gann suffered the ultimate deprivation, death. Obviously, elements 1, 2 and 3 have been satisfied, leaving as the crux of the problem whether the conduct which amounted to a deprivation of a liberty interest was without due process.

 Although life and liberty are fundamental constitutional interests, they are not absolute. Consequently, the determination of whether the deprivation amounts to a substantive violation of due process requires a case by case analysis. The standard for determining when liberty interests are violated in a mental hospital setting is found in *Youngberg*, 457 U.S. at 321, 102 S.Ct. at 2461.[1] The formulation takes into consideration the competing and often conflicting interests of individuals such as John Gann as against the State's interest in administering to the needs of the mentally disturbed and, in particular, rendering medical opinions as to treatment and safety. On the one hand is the obligation of protecting the liberty (life) interests of committed persons and, on the other hand,

is the obligation to render opinions regarding their safety in a way that is compatible with the need to service their malady. To say, for instance, that *all* mentally disturbed persons must be accorded absolute safety without regard to the nature and severity of the mental disorder or without regard to the uniqueness of the individual under treatment would destroy much of the value of what the professional has to offer and, indeed, frustrate to a great degree the societal needs assumed by the State in agreeing to care for these people. Without professional judgment and discretion, the execution of preordained treatment programs would lead to abhorrent results. The balancing of these conflicting interests leads ineluctably to the conclusion that for constitutional purposes, it is enough if professional judgment is rendered. The Supreme Court has decided that, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462.

 The Defendants have represented to the Court that professional judgment was exercised in the treatment of John Gann.[2] The Plaintiffs, however, have filed an opposing affidavit which states that the Defendants' actions "departed so significantly from acceptable standards of professional judgment, practice or standards as to demonstrate that the decisions were not based on professional judgment." [3] Such a clear factual dispute cannot be resolved on summary judgment. The determination of

---

1. In the context of a different factual setting, see the analysis in *Davidson v. O'Lone*, 752 F.2d 817 (3d Cir.1984), establishing standards for determining a substantive violation of the fourteenth amendment cognizable under section 1983.

2. The Defendants also argue that the fact that the Delaware State Hospital was accredited by the Joint Commission on Accreditation of Hospitals ("JCAH") is proof of constitutionally adequate care. Such accreditation might provide *prima facie* proof of adequacy but Plaintiffs' affidavit stating that professional judgment was

not exercised is sufficient to rebut such a showing. *See, Woe v. Cuomo*, 729 F.2d 96, 106 (2d Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984).

3. The Court has considered the objections to the affidavit filed by counsel for Dr. Vergara. However, those objections go merely to the sufficiency of Dr. Mechanick's observations and do not eliminate the issues of fact raised by the affidavit.

whether professional judgment was in fact exercised requires a balancing of factors which can only be performed on a fully developed factual record. *Wilder v. City of New York*, 568 F.Supp. 1132, 1137 (E.D. N.Y.1983).

## IMMUNITY

The Defendants next argue that despite this factual dispute, summary judgment should be granted because the Defendants, as employees of the State of Delaware, may claim the benefit of official immunity. The standard for official immunity was set forth by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under that standard, immunity is available only to officials whose conduct conforms to a standard of "objective legal reasonableness." *Id.* at 819, 102 S.Ct. at 2739. An official is protected by qualified immunity except in those instances where his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2739.

The Plaintiffs argue that the Defendants are not entitled to immunity because they violated clearly established decisional *and* statutory law. Mere violation of a state statute that does not create a cause of action under section 1983, however, cannot be used to overcome qualified immunity. *Davis v. Scherer*, — U.S. —, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984). There has been no claim in this case that the Delaware Mental Patient's Bill of Rights, 16 *Del.C.* § 5161, the statute Plaintiffs claim represents clearly established law, is the basis for their cause of action under section 1983. Therefore, the statute cannot be relied upon as clearly established law for the purposes of defeating qualified immunity.

Thus, the question facing this Court is whether *decisional* law creating a constitutional right to safe conditions was clearly established at the time of Gann's

death. The Defendants claim that it was not because the Supreme Court's acknowledgment of the right did not come until the *Youngberg* decision of 1982. However, a Supreme Court decision is not absolutely imperative before law may be considered "clearly established" under *Harlow*. In *People of Three Mile Island v. Nuclear Reg. Com'rs*, 747 F.2d 139 (3d Cir.1984), the Third Circuit addressed the issue of how "clearly established" law must be in order for it to defeat qualified immunity.

We adopt the second approach—requiring some but not precise factual correspondence and demanding that officials apply general, well developed legal principles. Such a formulation of the law better strikes the balance between the competing interests that the Supreme Court identified when it fashioned the contours of executive immunity. While we cannot expect executive officials to anticipate the evolution of constitutional law, neither can we be faithful to the purposes of immunity by permitting such officials one liability-free violation of a constitutional or statutory requirement.

*Id.* at 144–45.

Opinions from this district also suggest that the "general legal principles" referred to by the Third Circuit do not have to be Supreme Court opinions directly on point. This district has held that a ruling of the Third Circuit is enough for law to be considered "clearly established." *Dehorty v. New Castle County Council*, 560 F.Supp. 889 (D.Del.1983). This district has also noted that the rulings of three Courts of Appeals (not including the Third Circuit) are sufficient for a legal principle to be considered well established. *Masjid Muhammad-D.C.C. v. Keve*, 479 F.Supp. 1311, 1321 (D.Del.1979).

At the time of Mr. Gann's death, the Third Circuit had acknowledged that individuals involuntarily committed to mental hospitals have a right to a secure environment.[4] *Romeo v. Youngberg*, 644

---

4. The opinion does not specifically state that the right to safety includes protection from harm to

F.2d 147, 162–64 (3d Cir.1980). The Defendants question the conclusiveness of the opinion on the basis that the *en banc* majority opinion garnered only five votes with four judges joining in the opinion by concurrence. What the Defendants do not note, however, is that both the majority opinion and the concurrences acknowledge the right to safety—the only difference is in the standard applied to determine when the violation of that right infringes upon fourteenth amendment rights. 644 F.2d at 163; 644 F.2d at 177, Seitz, J. concurring.

If the Third Circuit had decided *Romeo* a month or two sooner, the principle that involuntary inmates in a state mental hospital have a constitutional right to safety would have been unquestionably established in this district. However, *Romeo* was decided on December 12, 1980, only seven days prior to John Gann's suicide of December 19, 1980. It is questionable whether such short notice could have provided Defendants with adequate awareness of the law.

Although the Third Circuit decision alone may not have been enough to render the legal principle clearly established, *Romeo* was not the first case to find that individuals involuntarily confined in a mental hospital have a constitutional right to safety. Three circuits as well as a number of district courts had acknowledged such a right prior to *Romeo*. *Goodman v. Parwatikar*, 570 F.2d 801, 804 (8th Cir.1978); *Harper v. Cserr*, 544 F.2d 1121, 1123 (1st Cir.1976); *Spence v. Staras*, 507 F.2d 554, 557 (7th Cir.1974); *Evans v. Washington*, 459 F.Supp. 483, 484 (D.C.D.C.1978); *Welsch v. Likins*, 373 F.Supp. 487, 502–03 (D.Mn. 1974), *aff'd*, 525 F.2d 987 (8th Cir.1975); *New York St. Ass'n for Retard. Child., Inc. v. Rockefeller*, 357 F.Supp. 752, 764 (E.D.N.Y.1973). In contrast, Defendants have been unable to cite even one case denying the existence of such a right.

one's self as well as harm from others. However, such a right is subsumed in the right to a "basically safe and humane living environment" established in *Youngberg*. See, *Harper v. Cserr*, 544 F.2d 1121 (1st Cir.1976).

Further support that this right to safety was clearly established may be found in some of the eighth amendment prison cases.[5] In *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the Supreme Court noted that "deliberate indifference to serious medical needs of prisoners" violates the eighth amendment. Individuals who are involuntarily confined in a mental hospital certainly should have no less rights than a prisoner. *New York St. Ass'n for Retard. Child., Inc. v. Rockefeller*, 357 F.Supp. at 764. Indeed "[i]t would be anomalous to find that the right to a secure environment, which federal courts have often intervened to protect in the context of penal institutions, did not extend to facilities for the mentally retarded." *Romeo*, 644 F.2d at 162.

Thus, in December of 1980, the right to a safe environment for those involuntarily committed to mental institutions had received wide acceptance by the courts. The right was a general, well developed legal principle that officials at a state mental hospital should have been applying daily. If they did not do so, they have forfeited the privilege of official immunity.

## LIABILITY OF EACH INDIVIDUAL DEFENDANT

■ Although the Defendants cannot claim the benefit of official immunity, they go on to argue that the individuals who had no involvement with John Gann's treatment cannot be held personally liable for damages under 42 U.S.C. § 1983. Traditional concepts of respondeat superior do not apply to actions brought under section 1983. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). An "affirmative link" between the injury and the Defendants' conduct is essential to the showing of causation. *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561

5. Plaintiffs have not made an eighth amendment claim in this use.

(1976). In order to establish such an "affirmative link" the Third Circuit has required an examination of the extent to which the individual "participated in a pattern of violation by virtue of knowledge, acquiescence, support and encouragement." *Black v. Stephens,* 662 F.2d 181, 189 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982).

For several of the Defendants in this case, the link between any alleged violations of John Gann's constitutional rights and the individual's activity is clear. Drs. Tonogbanua, Ausejo and Vergara all participated directly in formulating treatment decisions in the case. As noted earlier, whether such treatment decisions departed so substantially from professional judgment as to violate the *Youngberg* standard is an issue of fact and must be decided at trial. Those three individuals all had enough personal knowledge of John Gann's case to expose them to potential liability under section 1983.

For the remaining Defendants, the link between the alleged violations of John Gann's constitutional rights and the individuals' activity is less certain. Patricia Schramm, Sheldon Schweidel, Robert Feeney, Anne Willard and Dr. Robert Buckley never saw John Gann alive. The Plaintiffs claim that the actions of the individuals in refusing to correct treatment decisions concerning Gann and their role in formulation of the hospital policy established enough of a causal connection to expose them to liability under section 1983. Indeed, supervisory personnel may expose themselves to liability by knowing and acquiescing in unconstitutional conduct by subordinates. *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976). However, such unconstitutional conduct, without actual knowledge of the specific wrong being committed, can only result in liability under section 1983 when there has been a "pattern or practice of constitutional violations." *Com. of Pa. v. Porter,* 659 F.2d 306, 325 (3d Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). The Plaintiffs must demonstrate

that the Defendants' inaction occurred in the face of knowledge that the institution was failing to adequately protect the individual's constitutional rights. See, *Doe v. New York City Depart. of Social Services,* 649 F.2d 134, 145 (2d Cir.1981), *cert. denied,* —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Showing that individual officials violated a person's constitutional rights on an isolated occasion is not sufficient to raise an issue ·of fact as to whether adequate policies and protection were implemented. "Supervisors cannot automatically be held liable for a subordinate straying from the established path." *McClelland v. Facteau,* 610 F.2d 693, 697 (10th Cir.1979).

A number of factors should be considered in determining whether a supervisor may be held liable without direct participation in the violation. These include the knowledge the supervisor has or should have over the situation, the degree of authority and control of the supervisor, the policies which relate to the conduct and, finally, the extent to which the supervisor has encouraged or acquiesced in the conduct. *Santiago v. City of Philadelphia,* 435 F.Supp. 136, 151 (E.D.Pa.1977).

An evaluation of these factors in regard to the Defendants Patricia Schramm, Sheldon Schweidel, Robert Feeney, Dr. Robert Buckley and Anne Willard leads the Court to conclude that only Dr. Buckley had enough knowledge and control of the situation at issue to bear potential liability for the alleged violation of Gann's constitutional rights. As Medical Director of DSH, Dr. Buckley was in charge of all medical decisions made at the hospital. Such authority was more than nominal and Dr. Buckley actually reviewed decisions of the staff physicians regarding admissions and other matters. In John Gann's situation, Dr. Buckley had reviewed the report of Gann's December 12 admission and assignment to the Admissions Ward. In addition, Dr. Buckley was .aware of Gann's unauthorized absence from DSH on December 16. With this knowledge and the authority possessed by the medical director of

the hospital, Dr. Buckley certainly had enough involvement in the Gann incident to be subject to potential liability under section 1983.

In regard to the rest of the Defendants, Patricia Schramm, Sheldon Schweidel, Robert Feeney and Anne Willard, the Court grants summary judgment. Patricia Schramm, the Secretary of the Department of Health and Human Services at the time of the incident, is not even cited in Plaintiffs' affidavit for lack of professional judgment. Sheldon Schweidel should also be excluded from liability. As Director of the Division of Mental Health for the State of Delaware, he was never aware of John Gann's presence at DSH, had little, if any, supervisory authority over personnel at DSH and did not participate in the training of personnel at the DSH. Plaintiffs allege that he bears responsibility because of his failure to formulate and enforce adequate . policies at DSH. Such allegations, in the absence of evidence of a pattern of constitutional violations at DSH are insufficient to impose liability on Schweidel who had no personal knowledge of the Gann incident.

The same is true of Robert Feeney, the Director of DSH. Although Feeney had some awareness of Gann's unauthorized absence through the hospital's routine reporting system, he did not have the authority to change the conditions of Gann's confinement since all medical decisions were left to the medical director, Dr. Buckley. Like Sheldon Schweidel, Robert Feeney cannot be held responsible for any violation of one patient's rights in the absence of a documented pattern or practice of such violations.

Finally, the Court grants summary judgment to Anne Willard, the Director of Nursing at DSH. Although she too was aware of John Gann's situation through the hospital's routine reporting system, she had no authority to alter the terms of Gann's confinement. As head of nursing at the time, Anne Craig was in part responsible for the enforcement and creation of the policies regarding missing patients but,

in the absence of any direct personal role in the search for Gann after he was reported missing or, in the absence of proof of a pattern of such deficiencies, she cannot be held responsible.

Thus, the Court grants summary judgment in favor of Defendants Patricia Schramm, Sheldon Schweidel, Robert Feeney and Anne Willard because of their lack of personal involvement in the Gann situation.

## PLAINTIFFS' INDIVIDUAL CLAIM

The final issue to be decided in this summary judgment motion is whether Plaintiffs have the right to obtain damages for the death of John Gann in their individual capacities. It is not contested that Plaintiffs have a right to damages for the death of their son as representatives of his estate. However, they also claim that their own constitutional rights were violated by his death. Some courts have recognized that a violation of a child's civil rights leading to his death creates an independent cause of action in the parent for violation of the right to parenthood. *Mattis v. Schnarr*, 502 F.2d 588 (8th Cir.1974), on remand, 404 F.Supp. 643 (E.D.Mo.1975), rev'd, 547 F.2d 1007 (8th Cir.1976), *vacated and remanded sub nom., Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), *reh'g denied*, 433 U.S. 915, 97 S.Ct. 2990, 53 L.Ed.2d 1102 (1977); *Bell v. City of Milwaukee*, 536 F.Supp. 462, 467 (E.D.Wis.1982), *aff'd in part, rev'd in part*, 746 F.2d 1205 (7th Cir.1984); *Smith v. Wickline*, 396 F.Supp. 555, 565 (W.D. Okl.1975). However, the interpretation of the law of the Third Circuit leads this Court to conclude that such a right is not recognized in a situation involving a non-minor child.

In *Denman v. Wertz*, 372 F.2d 135 (3d Cir.), *cert. denied*, 389 U.S. 941, 88 S.Ct. 300, 19 L.Ed.2d 293 (1967), the Third Circuit upheld the dismissal of a complaint by a father charging interference with his parental relationship with his minor children

on the grounds that the father had no constitutional right to parenthood. In reliance upon *Denman,* two Pennsylvania district courts have held that a parent may not maintain a civil rights action for the wrongful death of a child. *Anderson v. Erwin,* C.A. No. 76–2020, slip op. (E.D.Pa. Dec. 20, 1976); *Strickland v. City of Easton,* C.A. No. 75–93, slip op. (E.D.Pa. Oct. 27, 1976). On the other hand, one district court decision, relied upon extensively by Plaintiffs, has distinguished *Denman* and concluded that the killing of a child deprives the parents of a fundamental constitutional right for which parents may obtain redress. *Jones v. McElroy,* 429 F.Supp. 848 (E.D.Pa.1977).

However, *Jones* differs from both *Denman* and the present situation. The *Jones* court specifically distinguishes *Denman* by stating that the *Denman* decision was based on the fact that the father had no legal right to the custody of his children in the first place. 429 F.Supp. at 853. He had abducted and unlawfully taken the children from their mother to whom legal custody had been awarded. In this case, as in *Denman,* the parents had no legal right to custody of their child since John Gann was over the age of eighteen. Therefore, this Court must follow the reasoning of *Denman* and find that where the parents had no legal right to the child's companionship, interference with the relationship between parents and their offspring is not actionable under the Civil Rights Act.

For the foregoing reasons, Defendants' motion for summary judgment is granted on Plaintiffs' equal protection claim and Plaintiffs' claim for relief in their individual capacity. Summary judgment is also granted in favor of Patricia Schramm, Sheldon Schweidel, Robert Feeney and Anne Willard on Plaintiffs' due process claim. Summary judgment is denied Defendants Robert Buckley, M.D., Gabino Tonogbanua, M.D., Felix Vergara, M.D., and Auzcena Ausejo, M.D., on Plaintiffs' due process claim.